*To be Argued by Michael H. Sussman, Esq.*

# 25-857

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

--------------------------------------------------------

SAMANTHA RYS,

*Plaintiff-Appellant,*

v.

SABRINA DAVIS, TANYA JOHNSON,

*Defendants-Appellees.*

--------------------------------------------------------

## On Appeal from an Order and Judgment of the
## United States District Court for the Southern District of New York

---

## APPELLANT'S BRIEF-IN-CHIEF AND SPECIAL APPENDIX

---

SUSSMAN & ASSOCIATES
*Attorneys for Plaintiff-Appellant*
1 Railroad Avenue, Suite. 3
P.O. Box 1005
Goshen, New York 10924
(845) 294-3991 [Tel]
(845) 294-1623 [Fax]
sussman1@sussman.law

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ..... 1

STATEMENT OF ISSUES PRESENTED ........................................................ 2

STATEMENT OF THE CASE .......................................................................... 2

STATEMENT OF FACTS ................................................................................ 2

SUMMARY OF ARGUMENT ........................................................................ 22

STANDARD OF REVIEW .............................................................................. 23

ARGUMENT .................................................................................................... 24

    Point I

    Appellant's affidavit was not a "sham," was based on her personal
    knowledge, and could not be discounted in resolving this motion ............... 28

    Point II

    A reasonable jury could conclude that Appellant established that
    she was subjected to a racially hostile work environment, and the
    district court erred in granting summary judgment ...................................... 33

    Point III

    A reasonable jury could find Appellees caused Appellant's
    constructive discharge ................................................................................. 42

CONCLUSION ................................................................................................ 45

CERTIFICATE OF COMPLIANCE ................................................................ 46

i

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Ames v. Ohio Dept of Youth Services*,
    145 S.Ct. 1540 (2025)..................................................................................44

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)...................................................................................23

*Buon v. Spindler*,
    65 F.4th 64 (2d Cir. 2023) ...............................................................24, 25, 26

*Burgess v. Costco Wholesale Corp.*,
    2024 WL 433617 (S.D.N.Y. September 27, 2024) ..................................32, 33

*Chen v. Matsu Fusion Restaurant, Inc.*,
    2022 WL 3018105 (S.D.N.Y., July 29, 2022)..............................................32

*Danzer v. Norden Systems, Inc.*,
    151 F.3d 50 (2d Cir. 1998) ....................................................................23, 24

*Feingold v. New York*,
    366 F.3d 138 (2d Cir. 2004) .......................................................................24

*Flaherty v. Filardi*,
    2007 WL 163112 (S.D.N.Y. Jan. 24, 2007) ................................................28

*Ga Ho Kim v. DK Cosmetics, et al.*,
    2022 WL 540675 (S.D.N.Y. Febr. 23,2022) ..........................................31, 32

*Harris v. Forklift Systems, Inc.*,
    510 U.S. 17 (1993)...............................................................................26, 27

*Hayes v. N.Y.C. Dep't. of Corr.*,
    83 F.3d 614 (2d Cir. 1996) .........................................................................32

*Holcomb v. Iona College*,
    521 F.3d 130 (2d Cir. 2008) .................................................................23, 24

*Kaytor v. Electric Boat Corp.*,
609 F.3d 537 (2d Cir. 2010) ........................................................................27, 28

*Langman Fabrics v. Graff Californiawear, Inc.*,
160 F.3d 106 (2d Cir. 1998) ................................................................................30

*Littlejohn v. City of New York*,
795 F.3d 297 (2d Cir. 2015) ................................................................................26

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973).............................................................................................26

*Morris v. Landau*,
196 F.3d 102 (2d Cir. 1999) ................................................................................24

*Palazzo ex rel. Delmage*,
232 F.3d 38 (2000) ..............................................................................................32

*Patane v. Clark*,
508 F.3d 106 (2d Cir. 2007) ................................................................................33

*Perez v. Manna 2nd Ave. LLC*,
2016 WL 7489040 (S.D.N.Y. December 28, 2016)...........................................32

*Petrisino v. Bell Atl.*,
385 F.3d 210 (2d Cir. 2004) ................................................................................42

*Raniola v. Bratton*,
243 F.3d 610 (2d Cir. 2001) ................................................................................28

*Reeves v. Sanderson Plumbing Products, Inc.*,
530 U.S. 133 (2000).............................................................................................24

*Rentas v. Ruffin*,
816 F.3d 214 (2d Cir. 2016) ................................................................................28

*Reyes v. Westchester Cty. Health Care Corp.*,
2021 WL 4844285 (2d Cir. Oct. 25, 2021) ........................................................35

iii

*Rivera v. Rochester Genesee Reg'l. Transp. Auth.*,
    743 F.3d 11 (2d Cir. 2014) .................................................................41

*Rule v. Brine, Inc.*,
    85 F.3d 1002 (2d Cir. 1996) ..............................................................33

*Schiano v. Quality Payroll Sys.*,
    445 F.3d 597 (2d Cir. 2006) ..............................................................27

*Stern v. Trustees of Columbia University*,
    131 F.3d 305 (2d Cir. 1997) ..............................................................36

*Terry v. Ashcroft*,
    336 F.3d 128 (2d Cir. 2003) ..............................................................42

*United States v. City of Yonkers*,
    837 F.2d 1181 (2d Cir. 1987) ........................................................26, 36

*Vega v. Hempstead U.F.S.D.*,
    801 F.3d 72 (2d Cir. 2015) .................................................................24

*Village of Arlington Heights v. MHCD*,
    429 U.S. 252 (1977).......................................................................25, 36

**Statutes**

28 U.S.C. § 1291 .......................................................................................2

28 U.S.C. § 1331 .......................................................................................1

42 U.S.C. § 1983 .......................................................................................1

**Federal Rules**

Fed. R. App. P. 4(a)(1)(A) ........................................................................2

Fed. R. Civ. P. 56(a)................................................................................23

## PRELIMINARY STATEMENT

On June 5, 2025, the Supreme Court unanimously declared that Title VII's prohibitions against discrimination protect members of majority and minority groups. The same applies to the guarantee of equal protection under the law afforded by the Fourteenth Amendment. In this case, a Caucasian was subjected to disparate treatment, as well as workplace comments, which, if similarly directed toward a minority group member, would create issues of fact for jury resolution of claims of racially hostile work environment and constructive discharge.

Yet, the district court interpreted the facts most favorably to defendants/appellees and resolved credibility issues, going so far as to hold that appellant submitted a "sham affidavit" to create issues of fact. Instead, the record shows that appellees presented scant factual evidence disputing appellant's factual assertions or establishing legitimate non-discriminatory reasons for their treatment of the appellant. The district court decision is due to be reversed and the matter remanded.

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

As Rys's claims arise under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution, the district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983. On March 24, 2025, the district court entered a final judgment dismissing the action. On April 8, 2025, Rys timely

filed her notice of appeal.  As such, this Court has appellate jurisdiction under 28 U.S.C. § 1291. *See also* Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF ISSUES PRESENTED

(1) Whether a reasonable jury could conclude that Appellant was subjected to a racially hostile work environment?

(2) Whether a reasonable jury could conclude that Appellant was constructively discharged as a consequence of that racially hostile work environment?

## STATEMENT OF THE CASE

On December 21, 2022, Plaintiff-Appellant Samantha Rys ["Rys"] filed the instant case, alleging that her two African American supervisors, Sabrina Davis and Tanya Johnson, violated the Equal Protection Clause of the Fourteenth Amendment by subjecting her to a hostile work environment on account of her race, causing her constructive discharge from her position as Parole Officer ["PO"]. JA-23-31.

On April 25, 2023, Appellees answered, JA-32-42, and discovery ensued. In May 2024, Appellees filed their motion for summary judgment. JA-43.  Appellant opposed the motion, which the court granted on March 24, 2025. SA-1-27.  On April 8, 2025, Appellant timely noticed her appeal. JA-7.

## STATEMENT OF FACTS

The New York State Department of Corrections and Supervision ("DOCCS") employed Appellant as a Parole Officer ("PO"). JA-98:14-21.  She commenced her

2

PO training at the Academy located in Albany on March 28, 2021. JA-115:15-23; JA-506-07, JA-510, ¶ 11. She completed the academy on or about May 21 and commenced her assignment in Brooklyn on May 24, 2021. JA-614-15.

On March 24, 2021, prior to commencing the Academy, and during the application process, Appellant completed a form ranking her location preferences. Acosta-Pettyjohn Decl. Appellant completed this form ranking five bureau locations. None of her preferred locations was in New York City. JA-616.

Before Appellant commenced at the academy, an investigator from parole contacted her and offered Manhattan as her bureau. She accepted that assignment. Appellant understood that parole offered positions based on test scores, that she scored a 90, was called and offered a placement, and that she had the choice of taking or rejecting that placement. She was offered Manhattan as her placement and accepted because her dependent [daughter] was then going to graduate school there. JA-130:18-131:7.

Shortly after commencing the Academy, an Academy instructor, S.P.O. Hamilton, told Appellant that she would be assigned to the Brooklyn Parole Office ("Brooklyn Office"). JA-128:3-129:13. Appellant explained the prior commitment to S.P.O. Hamilton and sought an explanation for the shift in assignments. S.P.O. Hamilton told her that "a lot of people flunked out in Brooklyn . . . and that Brooklyn needed bodies[,]" JA-133:9-18, and advised her to put in a memo as she could not

use her cell phone while at the academy. Heeding this advice, Appellant wrote a memo seeking to have Parole honor the offer she accepted, that is, to work at the Manhattan bureau. JA 127:23-131:5. This did not work.

On May 24, 2021, at 12:15am, prior to commencing her first day at the Brooklyn Office, Appellant submitted a P3 Transfer Form request with Human Resources ("HR"). JA-154:3-22; JA-510, ¶ 13, JA-513-15. She requested the transfer because she believed her assignment was a mistake, that her score on the PO exam was high, and that the commute was too long. JA-155:3-12; JA-521.

A P3 Transfer Form is a form that DOCCS employees wishing to be placed on, or withdraw from, reassignment/transfer lists must fill out and submit to HR. JA-509 ¶ 6, JA-512-15. The deadline to file a P3 Transfer Form was March 31, 2021. JA-509, ¶ 6, JA-512-15. An employee cannot submit a P3 Transfer Form until after they have completed Academy training and have reported to their official assigned work location. JA-510, ¶ 8. Of course, as of March 31, 2021, Appellant had not graduated from the Academy and been given a formal assignment. Moreover, the transfer policy did not preclude later submissions, *id.*, and Appellant was never advised of any such deadline or provided any such advice. Instead, S.P.O. Hamilton told her to submit the transfer form upon commencing at the Brooklyn bureau office which is what she did. JA-316-318, JA-603 ¶ 2. Appellant could not

4

have submitted her request before she did regardless of the deadline shown in Parole's Reassignment and Transfer Policy. JA-512-515.

Appellant filed a P3 Transfer Form after March 31, 2021, and HR added Appellant to the late add on portion of the transfer list. JA-509 ¶¶ 6-7, 14. No one associated with Appellee apprised Appellant of either the deadline or the manner in which her transfer request was being treated. JA-603 ¶ 2.

On the form, Appellant requested transfer to 1) Poughkeepsie; 2) Albany; 3) New Rochelle; 4) Schenectady; and 5) Peekskill. JA-510-11, ¶ 15, JA-519.

Appellant was directed to report to the Brooklyn Office and did so on May 24, 2021. AJA-134:12-23; JA-510, ¶ 12. She was supervised by Appellee SPO Johnson, who reported to Appellee BC Davis. JA-405:20-22. Between May and August 2021, Appellant was the only Caucasian Parole Officer Appellee Johnson supervised. JA-447. Indeed, Johnson could not remember the name of any other Caucasian Parole Officer she ever supervised. *Id.*

When canvassing for reassignments or transfers, the HR office offers transfers beginning with the most senior employee who is not restricted and work their way down the waitlist until an employee accepts the reassignment. JA-510, ¶ 10. But safety transfers supersede the process described herein by Appellees. JA-603 ¶ 3.

On June 18, 2021, Appellant complained to Appellee Johnson about her very lengthy commute and her concern that she would be late to work due to the traffic.

5

JA-409:8-22. Johnson claimed she "instructed her [Appellant] to contact personnel as well as to complete the transfer form." JA-409:17-22. Johnson also told Appellant to leave her home earlier. Appellant explained she was doing this and the long hours were affecting her health. Johnson advised Appellant to speak with Appellee Davis. JA-603 ¶ 4.

Appellant did so and Appellee Davis told her to put her issue in an email to her supervisor, Appellee Johnson. She did not advise Appellant to submit a P3 as Appellant had already done this and explained this to both Appellees. Appellant sent an email on June 18, 2021, to Appellee Johnson. JA-603-04 ¶ 5.

Appellant made a separate transfer request, a safety transfer, to Appellee Johnson after an incident with a parolee named A.R.. JA-215:18-216:6, JA-218:10-18.

Between May 24, 2021, and August 21, 2021, Appellant's name did not move up on the waitlists. JA-511, ¶ 16.

Appellant was trained on the duties and responsibilities of a P.O. should a parolee violate the terms and conditions of their parole. JA-119:2-17, JA-142:6-15. In such an instance, she would prepare a Violation of Parole ("VOP") for review by a Senior Parole Officer. JA-120:6-10. If Parole drafts a VOP, it is submitted to the Court for signature, and following signature must be served on the parolee who awaits a Court date to answer the charge. JA-122:23-123:7.

6

Once the parolee is given a Court date, typically, both the parolee and PO attend the court hearing. JA-124:2-12. At the hearing, the PO informs the Court or the Administrative Law Judge ("ALJ") how the parolee violated his parole terms and conditions, and the ALJ decides if the parolee violated his parole conditions. JA-124:13-125:19.

While there is a pending VOP, a parolee can be issued a Supplemental Violation of Parole ("SVOP"). JA 126:17-127:2.

Appellant participated in a couple of VOP hearings in her short time serving as a PO. JA-124:13-19.

Upon her arrival at the Brooklyn Office, Appellant was trained on doing home visits, searches, and other day-to-day tasks of POs. JA-140:17-142:5. During her training at the Brooklyn Office, Appellant was assigned with another PO for on-the-job training. JA-143:8-19, JA-321:4-18.

All new POs are immediately assigned to a field training partner. JA-326: 16-22. This assignment lasts ten working days unless a new parole officer needs more field training. In Appellant's case, the assignment lasted less than ten workdays because she was ill during some of the time period. JA-604 ¶ 6, JA-143-145 (within the first four weeks of working at the Brooklyn Office, and during her scheduled field training, Appellant was absent from work and on sick leave after contracting

7

pneumonia), JA-143:25-145:14. While Appellant's field training was rushed because she was sick, she did well. JA-409:2-7.

After her training was complete, Appellant was issued a case load, which consisted of supervising parolees with different types of criminal convictions. JA-146:20-25, 149:23-8.

POs worked various hours, only working a set schedule of 8:30 A.M. to 4:30 P.M. during her "report day," which occurred once a week, or the "duty day," which occurred approximately twice a month. JA-411:10-412:19. POs also had to report to work at 8:30 A.M. to attend court hearings. JA-412:20-24.

POs within the Brooklyn Office supervised parolees in all five boroughs of New York City. JA-147:11-17, 149:12-22. Although Appellant was assigned to the Brooklyn Office, she supervised parolees in all five boroughs of New York City, as well as Long Island. JA-113:21-114:9.

The practice of the Brooklyn Borough Office was to pair parole officers to cover for each other in the office. When one PO was not available, the other would handle issues arising in her cases. JA-462. Bureau Chief Davis acknowledged that all parole officers had an assigned partner. JA-319-20, 323-328. As S.P.O., Appellee

8

Johnson was responsible for assigning partners to parole officers under her supervision in the Brooklyn office. JA-320.[1]

Johnson knew Appellant did not have a partner but did not assign her one. Instead, she told Appellant to find one herself. JA-604 ¶ 6. When Appellant advised Johnson that she had been unable to find a partner, Appellee Johnson told her to keep asking other probation officers whether they would partner with her. *Id.* Johnson treated new African American POs differently, assigning them partners. *Id.* ("all other POs in the office, including people who started with me, were given partners.") According to Johnson, written documents identify partner assignments in the office. JA-463. Appellees produced no such documents in this matter. Rys testified that she was never given a partner. JA-604 ¶ 6.

The Brooklyn Borough Office paired parole officers so they could work cases in the field together, enhancing safety. JA-462-64. Appellee Davis explained that, at times, there were mandates that POs would go into the field together but the pairings were not "permanent." Davis could not recall whether, when Rys was

---

[1] At deposition, Appellee Davis was asked the following question: "Paragraph 16 [of the Complaint] speaks about the issue of partner. It says, Plaintiff performed her out-of-office duties by herself without a partner. Do you see those words?" Davis answered, "I do." She was then asked, "In the bureau that you were then the bureau chief of, did the parole officers get assigned partners?" She responded, "Yes." She then indicated that either she or Johnson would have assigned the partner. She never suggested that the partner would only be for in-office coverage, as opposed to field work. JA-319-20. For her part, Appellant testified, "After field training ended, I was never given a partner and was forced to go into the field myself. I spoke with defendant Johnson about this and noted that all other POs in the office, including people who started with me, were given partners." JA-604 ¶ 6.

working in the Brooklyn bureau, there was such a mandate in effect. JA-328-30. Rys understood that other POs received emails with the identity of their partner, but she received no such email. JA-221:16-18.

When Appellant tried to find a partner to go into the field, two African American colleagues declined to partner with her, citing race-based reasons. *Id.* One, Patricia Brown, told Appellant that she should tan herself and get a hat, explaining that the only time Caucasians are seen in neighborhoods assigned to Appellant was when they needed to arrest someone or take their child. *Id.*[2] Appellant explained, "so… but it was very blatant that it was different for me." JA-220-21.

Another African American PO told Appellant she was a snow cone in the building and expressed concern for her safety in the field on account of her race. Appellant's Complaint recounts this comment, JA-25 ¶ 18, and Appellant did not first raise it in her Affidavit opposing summary judgment.

In short, Johnson never assigned Appellant an office partner or a field partner. JA-219, ll. 2-3, JA-604 ¶ 6. Rys testified that African American POs received both office partners and field partners. *Id.* Appellant was never assigned a field partner and had to go into the field alone. JA-218:24-219:2.

---

[2] Appellant did not report this comment to either Appellee Davis or Appellee Johnson. JA-222:16-21; JA-330:14-331:8.

10

When Appellant asked Appellee Johnson for a partner to travel to a location where she felt unsafe, Appellee Johnson suggested that Rys ask other POs to join her. JA-218:24-219:24. When she asked POs to partner with her, they "always had partners they had to go with." JA-220:20-21, JA-604 ¶ 6.

Appellee Johnson never encouraged any PO to accompany Appellant and never told Appellant she had done so. *Id.*

On one occasion, Appellant expressed concern about going to a particularly unsafe area without a partner. Appellee Johnson told her that two other parole officers were going together to the same area. Rys asked these officers if she could go with them; they were quite annoyed. She asked if one of them could drive as she had just driven 3.5 hours to get to work. They refused and told her to drive. JA-218. Appellant reported this to Appellee Johnson, who suggested that Appellant ask a different PO to partner with her. JA-219-221.

However, those with whom Appellant spoke would not partner with her, and two parole officers who did go in the field with her were very nasty and made her drive the entire day knowing of her commute. Johnson did nothing about this. *Id.*

Appellant did not further complain about this issue or report the race-based comments of other POs because she felt that Appellees did not help her at all. "Like the disregard of my life, it was like I was disposable. And that's the only way I can describe working there. I was very disposable from day one." JA-223.

11

## ASSIGNMENTS

The bureau chief assigned cases to parole officers. JA-331. As Bureau Chief, Appellee Davis assigned Appellant cases. *Id.* Parole officers "would be assigned a caseload and the caseload would indicate where individuals were living and what precinct they covered." JA-333-334.

Davis did not know what precincts she assigned Rys and knew of no way to pull up the caseload of a departed PO. JA-334:8-14. She did not believe there were email communications showing assignments. JA-334:15-19.[3] Davis assigned Appellant three police precincts while none of the African American parole officers then working from her unit were assigned more than two. JA-604-605 ¶ 7. Other POs approached Appellant noting her more onerous assignments. *Id.*

After Appellant raised her disparate assignment claim in her lawsuit, Davis never denied that Appellant was assigned three precincts while similarly situated African American parole workers were assigned two or explained this in any way. Indeed, as noted above, she did not remember and claimed she had no way to access Appellant's assignments. JA-334.

---

[3] The district court would not consider the fact that Davis did not deny Appellant's claim that she was assigned three precincts because Rys did not cite to record evidence supporting it. SA-6, n. 3. However, Davis's testimony was before the district court, and she did not have any recall of Rys' assignments, nor, she claimed, any way to re-create them. JA-334. On the other hand, Rys testified that she was assigned three precincts and most African American POs two. JA-604 ¶ 7.

12

After she resigned, Appellant received a going away card in which one of her African American colleagues wrote, "I have nightmares about the 76, 78 and 84," a reference to Appellant's three precinct assignments. JA-615.

Appellant did not know other POs caseloads, JA-225:7-14. Appellees never produced this information during discovery.

**APPELLANT'S CONTACT WITH A.R.**

On or about June 9, 2021, Appellant was assigned to Supervise Parolee A.R. JA-168:3-16; JA-543-562 [Parolee Chrono Notes]. Initially, she and A.R. enjoyed a good rapport. JA-172:2-13.

On or about June 16, 2021, A.R. was arrested for assault with injury while residing at a shelter. JA-169:2-25, 171:4-15, 173:21-25, 173:15-25, JA-543-562. Appellant spoke about A.R.'s arrest to an S.P.O., who informed her that she needed to write up a VOP against A.R. JA-169:22-170: 5, 173:2-3, 175:7-20, JA-543-562.

On June 22, 2021, Appellant spoke to A.R. on the phone and asked him to report to the Brooklyn Office the following day at 10:00 a.m. JA-169:2-170:8, JA-543-562. On June 23, 2021, A.R. arrived at the Brooklyn Office after Appellant left the Brooklyn Office and she did not see him that day. JA-169: 2-170:8, 176:6-10, JA-543-562.

After arriving at the Brooklyn Office, A.R. began to threaten other POs, whom he believed to be Appellant. JA-177:5-23, JA-543-562. Other POs arrested A.R. and

transported him to a detention center. JA-178:3-14, JA-455:6-11. While at the detention center, A.R. began to threaten self-harm, and was then transferred to the hospital for evaluation. JA-178:3-14, 179:2-12.

On June 23, 2021, A.R., a parolee made threats to harm Appellant. JA-605 ¶ 8. Rys and others reported these threats to Appellee Johnson. *Id.* Johnson claims she never had dealt with such a situation, *to wit*, a parolee threatening to rape and kill his PO. JA-470. SPO Johnson reported these threats to her Bureau Commander, Appellee Davis. JA-422.

On June 23, 2021, after making these threats, A.R. was transported from the Brooklyn Bureau to Lutheran Hospital in Brooklyn. JA-543-62. Though by then Appellee Johnson knew of the profane and violent threats A.R. made against Appellant on June 23, she directed Appellant to the hospital to attend to him. JA-185:14-17.

On June 24, 2021, Appellee Johnson directed Appellant to perform hospital duty since A.R. was Appellant's parolee. JA-179:16-23, 180:7-11. This assignment contravened Bureau practice of taking a parolee off of the caseload of a PO s/he has threatened with harm. JA-424:18-425:21.[4]

---

[4] The district court wrote that the parties contravene whether assigning plaintiff to the hospital after A.R. threatened her contravened DOCCS's practice of removing a parolee from a threatened PO's caseload. SA-7. However, there was no dispute that Johnson testified to this practice, as cited above, but that she and Davis did NOT separate Appellant from A.R. following the reported threats. Rather, they assigned Rys to the hospital. And there is no dispute that A.R. remained on Appellant's caseload through July 23, 2021, after Davis was re-assigned. SA-8.

When Appellant arrived at the hospital, Appellant introduced herself to A.R. JA-180:12-19. A.R. commenced screaming, yelling, and threatening Appellant. JA-180:12-25, JA-543-562. He escalated his threats of sexual and homicidal violence against Appellant in the presence of at least four other parole officers. JA-421-22, 429-30. Minutes after arriving to the hospital, Appellant called Appellee Johnson to inform her of the threats and A.R.'s demeanor and asked to be removed from hospital duty. JA-180:12-181:8, 185:8-13, 185:18-21, JA-421:6-422:5, JA-543-562. Appellee Johnson agreed to remove Appellant from hospital duty and sent two other POs to replace Appellant. JA-180:12-18:13, 181:22-24; JA-311:5-25, JA-341:20-342:22, JA-543-562. Appellant's replacements arrived at the hospital not long after Appellant spoke to Appellee Johnson. JA-184:25-186:4.

Appellant returned from the hospital detail and she and PO Verna Cheyne documented the vile sexual and homicidal threats A.R. made to her and her family. JA-556-67. Appellant also spoke to Appellee Johnson about the events that transpired. JA-186:22-187:6. PO Cheyne told Appellant that she never saw a parolee as obsessed or fixated on hurting anyone as intensely as A.R. was about harming appellant. JA-605-6, para. 12. On the same day as these threats, Appellant filled out an unusual incident report regarding the events that had just transpired. JA-187:23-188:10; JA-431-32.

15

As noted above, "typically," after this kind of incident, the PO is relieved of responsibility for the threatening parolee. JA-425-26. Consistent with this practice, on June 25, 2021, the following day, the Office of Special Investigations [OSI] member assigned to this case, Douglas Holland [Holland], advised appellee Davis that A.R. should be removed from Appellant's caseload. JA-300-301. He wrote appellee Davis, "PO Rys should be removed from this Parolee and another PO should be assigned this case." JA-533.

Appellee Davis acknowledged that ensuring parole officer safety was one of her responsibilities as Bureau Chief. JA-294. However, neither Davis nor Johnson removed A.R. from Appellant's caseload. JA-606 ¶ 13.

Johnson falsely claimed that she did then remove A.R. from Appellant's caseload. JA-426. She claimed she and Davis discussed this and Davis interposed no objection to removing A.R. from Appellant's caseload. JA-427-428. However, Appellee Davis did not remove A.R. from Appellant's caseload. JA-543-562; JA-606 ¶ 13. She claimed that she did not do so because this would have violated some unidentified Parole Division policy that a parolee who threatens a parole officer is not to be removed from that officer's caseload when a notice of violation arises from the underlying incident and the parolee is going through the violation process. JA-304-05. There is no such policy. JA-607 ¶ 21. Davis also claims that A.R. was not

16

transferred off Rys' caseload because he was not released to the community. JA-347.

Davis's testimony contradicts that of Johnson, who claims her supervisor interposed no objection to the immediate removal of A.R. from Appellant's caseload. JA-427-28. Johnson's testimony that she did remove A.R. from Rys' caseload "a few days after the incident occurred," JA-425:17-426:2, is false because A.R. remained on Appellant's caseload until after July 19, 2021. JA-543-562 (*see* entries through July 19, 2021, showing Rys as assigned as AR's PO).

Under Directive No. 9730, the Bureau Chief, here Appellee Davis, was responsible for developing a "plan of action" in response to AR's threats. DX-T. No such plan of action was ever developed or provided to Appellant, the target of AR's threats. JA-606-07 ¶ 16.

On June 25, 2021, Appellee Johnson directed all POs involved in the A.R. incident to immediately update the parolee database system regarding any interaction they had with A.R. JA-564. That same day, Appellee Davis forwarded the threat report regarding the A.R. incident to OSI. JA-522-24 (threat report concerning the A.R. incident).

The threat report contains no reference to the threats made by A.R. against appellant on June 23, 2021, when he reported to the Brooklyn Office, threats that preceded Appellee Johnson directing appellant to be in A.R.'s presence the

17

following day at the hospital. The threat report indicated that the threats from A.R. should not be dismissed and should be investigated. JA-522-24.

On June 28, 2021, Appellee Davis forwarded a revised threat report to Holland, which, as noted above, indicated that the threats from A.R. should not be dismissed and should be investigated. JA-525-27. The report makes no reference to removing A.R. from Appellant's caseload, as Holland had recommended and neither Appellee did this. JA-606 ¶ 13.

Following his threats to her, neither Davis nor Johnson discussed with Appellant using the otherwise locked parking garage for her car. JA-60 ¶ 8.[5] Appellee Davis was transferred to another Parole Office, and her last day at the Brooklyn Office was July 14, 2021. JA-538-539. After Appellee Davis's transfer, BC Jefferies and BC Granum covered the responsibilities of BC at the Brooklyn Office. JA-445:13-446:9. After Davis's reassignment, Appellant spoke to Jeffries, begging for help, and he allowed her to use the garage for her safety at the very end of July 2021. JA-605 ¶ 8.

A.R. was scheduled for a VOP preliminary revocation hearing on or about July 19, 2021, with a final hearing scheduled for August 9, 2021. JA-543-562. On

---

[5] While appellees asserted below that "plaintiff was allowed to park in the garage," the district court criticized Appellant for controverting this passive voice claim by noting that neither of the appellees allowed her to do so and she had to go to another BC to make this happen long after A.R. threatened her. As Appellant claimed that her two supervisors acted with deliberate indifference toward her security needs, her response to the Rule 56.1 statement was entirely appropriate.

18

July 9, 2021, Appellant called Johnson to ask if her supervisor wanted her to overnight the subject's court date for Monday since "we may be out of date past that date," and to discuss how to serve the parolee with the legal papers. *Id.* There was never any acknowledgement by either appellee that continuing her involvement on this case after the vile threats made against her further imperiled appellant. JA-606 ¶ 14.

On July 19, 2021, Appellant appeared for A.R.'s hearing regarding his VOP concerning the incident at the shelter. JA-197:11-25, 198:11-20; JA-436:19-20. The hearing was conducted through a video application, Webex. JA-199:15-16; JA-436:22-437:5. A.R.'s case was dismissed due to a delay in conducting the hearing, and he was released from custody. JA-203:9-17; JA-531(email to/from OSI Investigator Holland and Appellee Davis). The hearing in this case was about a matter that preceded Rys' time as the assigned parole officer and could have been handled by anyone. Johnson neglected to review or sign-off on the SVOP, which related to A.R.'s conduct toward Appellant so that matter was not on the docket on July 19, 2021. JA-607 ¶ 20. Accordingly, the case against him was dismissed. JA-606 ¶ 15.

After the hearing on July 19, 2021, A.R. was ordered to report to the Brooklyn Office, but he absconded and failed to report to the parole office. JA-203:9-204:8;

19

JA-440:20-441:7; JA-531, 543-562. At the time, there was no safety plan in place for Appellant. JA-606-07.

On July 23, 2021, A.R. was removed from Appellant's caseload. JA-197:5-10; JA-425:4-23; JA-543-562. This was a month after Holland recommended this. And neither appellee did this; another bureau chief removed A.R. from Appellant's caseload. JA-607 ¶ 18. Davis did not even know where A.R. was during this time, and there is no practice preventing transfer of service in the case of a vile threat to a parole officer. *Id.* ¶ 21.

On July 29, 2021, Appellee Davis forwarded an email from Investigator Holland to BC Granum, because Appellee Davis was no longer the BC in the Brooklyn Office. JA-301:2-24; JA-531. Holland confirmed that A.R. was an "absconder" and asked appellee Davis and her supervisor: "Was PO Rys notified and were any steps taken to protect PO Rys?" JA-531. Neither Davis nor Johnson informed Appellant of the parolee's absconder status or of any plan to keep her safe by this time or thereafter. JA-606-07 at para. 16.

After A.R. was removed from her caseload, Appellant testified in an August 2021 parole revocation hearing against him. JA-607 ¶ 17.

On August 8, 2021, A.R. was placed in a medically induced coma, and on August 10, 2021, was transferred to another hospital. JA-529-530 (Holland's final investigative report).

In his final investigative report, Holland recommended that Appellant not be A.R.'s PO and not work in the same borough as A.R. *Id.* He also confirmed the very serious threats posed by A.R. against Rys that "could cause a recognized fear and undue stress to PO Rys and her family," and recommended that "Parole Office Samantha Rys continue not be his Parole Officers or work in the same borough." JA-534.

At a proceeding held on August 16, 2021, Appellant testified against A.R. JA-607 ¶ 17. The same day, A.R. awoke from his coma and continued to be held at the Bellevue Hospital Prison ward. JA-534.

Appellant submitted her resignation letter on August 18, 2021, with an effective date of August 20, 2021. JA-231, JA-562.

During the Academy, a non-party Academy instructor, PO Price, informed Appellant that the Brooklyn Office would be an adjustment for her, making Appellant believe that she was not going to fit in. JA-137:3-23, JA-138:9-18. SPO Hamilton suggested that Appellant was going to stick out in the Brooklyn Office, another comment she believed was all about her race. JA-138:22-139:11. Appellant concluded that these comments were made to her because she is Caucasian. JA-139:12-16. While Appellant never asked anyone in the Brooklyn Office about their race, JA-182:14-25, she was able to identify their race by observing and speaking with her co-workers. JA-605 ¶ 9.

21

Appellant repeatedly raised issue with Johnson about having to go out alone, without a partner, and asked for her assistance in this regard. Appellant believed the response related to her race because those with whom Rys interacted, including some of the parolees, expressed concern for her safety expressly on account of her race, and the fact that there were very few Caucasians in areas to which she was assigned and that residents believed that those Caucasians who did visit those neighborhoods were there either to arrest someone or take their child. JA-605 ¶ 10. Johnson reacted with indifference to Appellant's requests for assistance in partnering with other POs. Id.

## SUMMARY OF ARGUMENT

The district court erred when it concluded that no reasonable jury could find that Appellant was subjected to a racially hostile workplace and constructively discharged by and through Appellees' acts and omissions. Instead, a reasonable jury could find that, as a Caucasian, appellant was treated in a callous manner, which contravened agency practices, both with regard to the assignment of field partners, assignment of caseload, and by and through her supervisors' responses to a serious threat to her physical well-being. Appellant's response to these indignities was objectively reasonable in light of the totality of the circumstances.

22

The district court's conclusion that Appellant filed a "sham affidavit" to create issues of fact is also erroneous, as it was materially consistent with her deposition and, at worse, presented credibility issues for jury determination

## STANDARD OF REVIEW

This court reviews the district court's grant of summary judgment *de novo*. *See Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008).

Summary judgment is appropriate only where the moving party establishes there is no genuine dispute as to any material fact, entitling it to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A fact is material if its resolution could affect the outcome; a dispute is genuine if reasonable minds may differ on its resolution. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If a reasonable jury could find for the non-moving party, the motion must be denied. *Id.* at 250.

The Court must view the record in the light most favorable to the non-moving party, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in [its] favor." *See Holcomb*, 521 F.3d at 137.  In doing so, its function "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions . . . ." *Id.* at 255.  And "summary judgment may not be granted simply because the court believes that the plaintiff will

23

be unable to meet his or her burden of persuasion at trial." *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 54 (2d Cir. 1998).

The Court also must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000). As such, "the court should give credence to the evidence favoring the non-movant as well as the evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* Finally, summary judgment is ill-suited in cases turning on the issue of intent. *See Holcomb*, 521 F.3d at 137; *Morris v. Landau*, 196 F.3d 102, 111 (2d Cir. 1999) ("[S]summary judgment is inappropriate when 'questions of motive predominate' in the inquiry about the role the protected behavior played in the employment decision.").

## ARGUMENT

"The Fourteenth Amendment, as made actionable by 42 U.S.C. § 1983, provides public employees with the right to be free from discrimination." *Buon v. Spindler*, 65 F.4th 64, 78 (2d Cir. 2023) (quotations & citations omitted). "To state a claim under § 1983, an appellant must allege the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." *Id.* (quoting *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004)).

24

"A state employee acting in his official capacity is acting under color of state law." *Id.* (quoting *Vega v. Hempstead U.F.S.D.*, 801 F.3d 72, 88 (2d Cir. 2015) (internal quotation marks and citation omitted)). "Once the color of law requirement is met, an appellant's equal protection claim parallels his Title VII claim, except that a § 1983 claim, unlike a Title VII claim, can be brought against an individual." *Id.* (quotation & citation omitted).

"In order to prevail on an equal protection claim of racial discrimination, the appellant need not show that the decision-maker was motivated solely, primarily, or even predominantly by concerns that were racial: [*Washington v. Davis* does not require an appellant to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one. *Arlington Heights I*, 429 U.S. at 265, 97 S.Ct. at 563 (footnote omitted)].

Rather, an appellant needs only show that race was "a motivating factor." *Id.* at 266, 97 S.Ct. at 564 (emphasis added). Once it is shown that a decision was motivated at least in part by a racially discriminatory purpose, the burden shifts to the appellee to show that the same result would have been reached even without consideration of race. *Id.* at 270 n. 21, 97 S.Ct. at 566 n. 21; *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50

25

L.Ed.2d 471 (1977). If the appellee comes forward with no such proof or if the trier of fact is unpersuaded that race did not contribute to the outcome of the decision, the equal protection claim is established." *United States v. City of Yonkers*, 837 F.2d 1181, 1216-17 (2d Cir. 1987), cert. denied, 486 U.S. 1055 (1988).

Like a Title VII claim, a Section 1983 discrimination claim is analyzed "under the familiar three-step burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *Id.* (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015)). "First, the appellant must establish a prima facie case of discrimination. If the appellant establishes a prima facie case, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the disparate treatment. If the employer articulates such a reason for its actions, the burden shifts back to the appellant to prove that the employer's reason was in fact pretext for discrimination." *Id.* at 78-79 (quotations & citations omitted) (cleaned up).

Below, Appellees submitted, and the district court concluded, that Appellant fails to proffer evidence of harassment that is sufficiently severe or pervasive and, thus, failed to state a claim. To sustain a hostile work environment claim, Rys must adduce evidence "that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift*

26

*Systems, Inc.*, 510 U.S. 17, 21 (1993).  This is both an objective and subjective test. *Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 604 (2d Cir. 2006).

Importantly, "environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers merely present some especially egregious examples of harassment.  They do not mark the boundary of what is actionable.'" *Harris*, 510 U.S. at 22 (emphasis added).  Accordingly, "the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases." *Schiano*, 445 F.3d at 606 (emphasis added).

Courts evaluate the totality of the circumstances and consider a number of factors, including, without limitation, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.  Moreover, courts should consider the cumulative effect of appellees' conduct "and an appellant who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010).

27

Facially neutral conduct may qualify as race-based harassment if there is "some circumstantial or other basis for inferring that incidents [race]-neutral on their face were in fact discriminatory," and "given proof of instances of overt … hostility . . . a rational juror could permissibly infer that [a supervisor's] entire alleged pattern of harassment against [appellant] was motivated by her gender." *Id.*; *Raniola v. Bratton*, 243 F.3d 610 (2d Cir. 2001).

## **Point I**

### **Appellant's affidavit was not a "sham," was based on her personal knowledge, and could not be discounted in resolving this motion.**

Appellant's Declaration was based on her personal knowledge, conversations with her supervisors and peers, and observations of the practices of her supervisors. A reasonable trier of fact could believe that she had personal knowledge of each fact to which she attested. *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007). There was nothing "wholly improbable" about Appellant's Declaration, and her testimony [as well as that of her supervisors and the documentary record] raised triable issues of fact. *Rentas v. Ruffin*, 816 F.3d 214, 221 (2d Cir. 2016). Most critically, Appellees barely refuted her testimony and, while in a position to provide factual information to refute Appellant's claims, never did so.

Each of the reasons the district court cited for considering Appellant's as "sham affidavit" is insufficient to so characterize her testimony.

First, the district court concluded that plaintiff sought to create a triable issue with regard to her caseload. It first cited an answer she provided to this question,

"Q. And I know you testified earlier that you had the most undesirable caseload in the office. Who did you speak to, to believe that to be true?" Appellant responded,

"It was – it was indicated on --- in conversations and going down where I handled. It was in conversation. Just people would make remarks. I can't give you anything specific. But then in my card, which I believe is in discovery, it says right on it that it's – the person has nightmares about my caseload."

In her Declaration, appellant attested, "I was assigned three precincts. Cases arising within those precincts are then assigned to that parole officer. African American parole officers were assigned one or two, most usually two. I know this because we discussed the areas to which we were assigned. After I resigned, I received a going away card in which one of my African American colleagues wrote, "I have nightmares about the 76, 78 and 84," a reference to my assignments." JA-604-05 ¶ 7. Appellant attached the card to her Declaration at JA-610 and T. Brown signed it, making the reference. Appellant then declared, "While I did not know the

29

specific names and cases handled by other POs, I did know the geographic areas to which others were assigned and the number of precincts and their locations in the borough." JA-605.

The district court also cited deposition testimony in which plaintiff stated she was assigned two precincts; however, her own refreshed recollection and the card she submitted substantiate that she erred at deposition, which is different from claiming she sought to later create a triable issue of fact. This is particularly so when her Complaint clearly alleges that she was assigned a less desirable caseload than others. JA-25 ¶¶ 19-20. Appellant's refreshed recollection about the number of precincts she was assigned, as confirmed by the card from a peer, is a plausible explanation for the discrepancy in testimony and her declaration otherwise merely amplified prior testimony. *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir. 1998). Appellees provided no evidence refuting Appellant's claim and certainly could have done so in their response to her Counterstatement of Material Facts in Dispute.

The district court next found that Appellant fabricated a second racial comment by a peer, who described her as a "snow cone" and asserted that going out in the field where she was assigned would not be safe. JA-604 ¶ 6. But, the evidence is clear that Appellant did not make up this event after her deposition. Her complaint includes this very comment. JA-25 ¶ 18. At deposition, Appellees' counsel never

30

asked Appellant any questions about this comment. *Cf. Ga Ho Kim v. DK Cosmetics, et al.*, No. 19-CV-9079, 2022 WL 540675, at *3 (S.D.N.Y. Febr. 23,2022) (finding a sham affidavit where Lee answered specific questions at deposition concerning material fact in manner directly contradictory to his declaration). And the allegedly contradictory testimony the district court cites was not given in response to a question that asked her to recite all occasions where another PO made a racially related comment. JA-220, ll. 12-15. Appellant cannot be faulted for not mentioning this event in her response to a question which did not seek such information.

The third instance relied upon by the district court in concluding that Appellant created a sham affidavit is equally unsupportive of this conclusion. At deposition, Rys recounted speaking with Johnson about not having a partner as opposed to her African American peers who were assigned partners. JA-219 [she was the only new PO who did not get a partner and "would go to SPO Johnson for a partner to go into an areas that was…not safe."]. Instead of assigning her a partner, Appellee Johnson told Rys to ask co-workers to go out with her. JA-220. Appellant testified, "So they [a reference to her African American peers] always had partners to go with. And they would say, I can't, I got to go with such and such. And I said, okay." *Id.*

There is no inconsistency between this testimony and Appellant's Declaration opposing summary judgment. The sham affidavit rule does not apply where prior

31

testimony is not actually contradictory. *Palazzo ex rel. Delmage*, 232 F.3d 38, 43 (2000). Here, the district court does not identify a question that would reasonably have elicited any information in her deposition that contradicts Appellant's declaration. *Ga Ho Kim*, *supra*; *Perez v. Manna 2nd Ave. LLC*, No 15 4655, 2016 WL 7489040, at *2 (S.D.N.Y. December 28, 2016) (court may "strike declarations made in support of summary judgment if the declaration directly and unequivocally contradicts prior deposition testimony"). Nor was the issue of whether she was assigned a partner "created solely by an affidavit crafted to oppose a summary judgment motion." *Hayes v. N.Y.C. Dep't. of Corr.*, 83 F.3d 614, 619 (2d Cir. 1996).

The purported "sham declaration" here is not supported by the precedent the district court cited: in *Chen v. Matsu Fusion Restaurant, Inc.*, No. 19-CV-11895, 2022 WL 3018105, at *4-5 (S.D.N.Y., July 29, 2022), the court found that plaintiffs' affidavits "diverged wildly from [their] prior deposition testimony." No such conclusion is warranted here.

In *Burgess v. Costco Wholesale Corp.*, No. 21-CV-5178, 2024 WL 433617, at *4, n. 13 (S.D.N.Y. September 27, 2024), the primary liability issue turned on whether there was a pre-existing hole in a crossway in defendant's parking lot. At deposition, plaintiff stated she did not see any such hole and that she injured herself as the hole was being created. These admissions supported defendant's summary judgment motion. However, in her Rule 56.1 Statement, plaintiff made what

32

defendant claims are contrary statements and it asked the court to apply the "sham affidavit" doctrine.

The district court declined, holding that "the inconsistencies between Burgess' deposition testimony and her subsequent Rule 56.1 statement are not enough to invoke the sham affidavit principle." *Id.* The material inconsistencies in *Burgess* were far more significant than any the district court found here, counseling strongly against the application of this principle here. The declaration amplifies and explains critical issues and the district court abused its discretion in deeming Appellant's a sham declaration. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).

### **Point II**

**A reasonable jury could conclude that Appellant established that she was subjected to a racially hostile work environment, and the district court erred in granting summary judgment.**

Appellant presented sufficient evidence that the conduct she complains of was objectively severe and pervasive such that a reasonable person would find it hostile or abusive, that she subjectively experienced the environment and that it was created because of her race. *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007). The district court determined that "Plaintiff has failed to carry her burden because she has not shown that the alleged conduct occurred because she is Caucasian." SA-20. This

represents blatant fact-finding regarding Appellees' intent and arrogates the role of a petit jury.

As applied here, there are several distinct, complimentary objective elements of Appellant's hostile work environment claim. Taken together, they were sufficiently pervasive and severe as to cause a reasonable person to view the environment as abusive and hostile. First, a reasonable jury could conclude on the facts taken most favorably to Appellant that Johnson, Rys' immediate supervisor, assigned partners to all POs but her. There is no dispute that partners are important for safety and security reasons and to assist a PO ensure coverage for her cases when she is in the field, something which comprises about 50% of her time.

Appellee BC Davis testified that all POs are supposed to have partners, assigned to them by the SPO. Appellee SPO Johnson provided no explanation for her failure to assign Appellant a partner. She certainly never identified anyone she did so assign. Appellee Johnson obviously knew that she had not assigned Appellant a partner. Indeed, below, in her memorandum of law, Johnson claims that when Appellant told her of the hostile reception she had received from several of the POs she had approached to partner with her, "Appellee Johnson suggested appellant ask someone else to partner with her." Docket No. 28 at 14.

The district court interpreted the disputed evidence most favorably to Appellees, concluding that Johnson merely encouraged POs under her watch to

34

partner with others and did not assign African American POs partners. Rys disputed this specifically. JA-604 ¶ 6. The district court erred in determining which version of facts was true.

And the failure to assign a partner created a severe and pervasive condition because POs spent approximately 50% of their time in the field, and the absence of a partner daily heightened the stress Appellant experienced and evidenced a significant form of disparate treatment. The frequency of the discriminatory conduct, as well as its severity and its interference with Appellant's performance of her job, together suggest that this first form of disparate treatment qualifies as "hostile." *Reyes v. Westchester Cty. Health Care Corp.*, No. 21-410, 2021 WL 4844285, a *3 (2d Cir. Oct. 25, 2021) (summary order). Finally, Appellant testified that Johnson assigned partners to the African American workers and that she observed others working together and so representing their status to her. From this evidence, a jury could conclude that race played a significant role in the disparate treatment Appellant experienced.

Second, a reasonable jury could conclude that Appellant had a more onerous work assignment than other POs. Davis was the source of assignments and despite knowledge of Appellant's claim, Appellee Davis did not submit any evidence refuting its factual basis or explaining it. Such evidence would be in her possession. Specifically, Appellant alleged that she received parolees from three precincts and

35

that other POs under Davis's supervision received cases arising from one or two precincts and that, when combined with the absence of a field partner, Appellant was subjected to substantial risk while performing her job by herself.

The district court held that Appellant presented insufficient evidence of the caseloads of others. However, at deposition, Appellees testified that they could not reconstruct the caseloads assigned Appellant and lacked documentation concerning the matter. Appellant testified that a PO peer referred to her onerous caseload in a farewell card. The district court did not interpret the words, "one of my African American colleagues" (JA-605 ¶ 7) to refer to a PO, though it plainly did.

Third and most critically, Appellant alleges that when she was seriously threatened by A.R., both Davis and Johnson responded in a manner which displayed a callous disregard for her safety and security and deviated from substantive standards employed by their employer. Such deviations may be a tell-tale sign of discrimination. *Village of Arlington Heights v. MHCD*, 429 U.S. 252, 267 (1977) ("Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached."); *United States v. City of Yonkers*, *supra*, at 1221-1222; *Stern v. Trustees of Columbia University*, 131 F.3d 305 (2d Cir. 1997) (applying same standards in case of Caucasian appellant claiming discrimination as employed in cases involving minority group appellants).

Here, protecting POs is an essential supervisory responsibility, and one would expect supervisors to place high value in implementing measures to do so. Yet, despite the recommendation by OSI's senior investigator Holland on June 25, 2021, Davis and Johnson did not transfer A.R. from Appellant's caseload, did not take any steps to provide her parking in a more safe and available area, and did not timely comply with the agency directive which established both timelines for filing threat assessments and unusual incident reports and developing a "plan of action" to deal with the very serious threat to appellant's safety.

That Appellee Johnson knew that she should have transferred A.R. off Appellant's caseload is strongly inferred by her [false] testimony that she did so within days of the incident with Davis's support. This testimony contradicts that of Appellee Davis, who claimed that such a caseload transfer would have violated a non-existent department policy. Certainly, Davis never shared this ground for not transferring A.R. with Appellee Johnson since the latter supervisor claimed that she made the transfer with Davis's assent. A reasonable jury could reject both their accounts and credit Rys' account, which is supported by the documentary evidence – she was not transferred until a month after the incident, on July 23, 2021.

The district court held that the Appellees handled the A.R. event in a "facially neutral" manner. SA-23-24. But the evidence suggests that both appellees deviated from agency guidelines and the recommendations of OSI's Holland and subjected

plaintiff to additional risk. This is not facially neutral handling; it demonstrates deviations from typical policies, which a reasonable jury could regard as callous disregard for Appellant's well-being.

In so holding, the district court subjected Rys, as a Caucasian, to a different standard of inferring discrimination than our courts have routinely adopted in finding evidence sufficient to defeat summary judgment. Here, most critically, a reasonable jury could easily find Rys was subjected to material deviations from agency practices by these appellees. Such deviations evidence discrimination.

First, after the June 23 threats, A.R. should have been removed from her caseload and she should have been insulated from him. Instead, both appellees assigned her to guard him the next day at his hospital. One, appellee Davis, claimed contrary to agency practice, that A.R. could not be removed from Appellant's caseload because of the outstanding probation violation. But there is no support for this assertion in the record. And the second, appellee Johnson, obviously knew what she was supposed to do and falsely claimed to have made the reassignment within a few days. This misrepresented what occurred.

Nor did appellees ever explain why they did not develop the requisite safety plan or arrange for plaintiff to park in a secure garage. These were the type of actions supervisors were supposed to implement when dealing with a vile threat to a PO, but, in Rys' case, they were not. A reasonable jury could conclude that the reason

38

related to Appellant's race. And, that same jury could conclude that the other treatment about which Appellant complained, particularly Appellees' failure to assign her a partner, bespoke of the same disregard for agency practice and devaluation of the Appellant.

In discussing the creation of a hostile work environment, the district court barely considered the impact of Appellees' failure to respond to A.R.'s threats on the creation of a hostile work environment. In her Complaint, Appellant alleged [as she further explained at deposition] that she promptly drafted a Supplemental VOP after A..R. threatened her. She provided that document to Johnson who, as the senior parole officer, was responsible for signing off on it, filing it and assuring its service. Johnson did none of those things in a timely manner, causing A.R. to be released on July 19, 2021, following his virtual VOP hearing.

This series of events further demonstrated to Appellant the hostility of her environment and the callous disregard for her welfare, which contravened agency policies and standards. Indeed, ten days after A.R. absconded, Holland again wrote Davis and her superior, noting that A.R. was released from Rikers Island on July 19, was an absconder and querying, "Was PO Rys notified and were any steps taken to protect PO Rys?" JA-53.

Davis received the email and responded that BC Granum "is the new BC for Brooklyn 1," but provided no answers to Holland's inquiries. *Id.* The next day,

39

Appellant was allowed to use the garage for the first time, no thanks to either appellee in this case.

In response, below Appellees did not dispute that [a] neither transferred A.R. from Appellant's caseload until July 19, 2021; [b] neither developed any "plan of action' to promote the target [Rys'] safety and security; and [c] neither conferred with Rys about the development of such a plan of action.

Appellees claim that even if they failed to follow DOCCS' directive, which seems quite apparent, this is not *per se* a constitutional violation. Accepting that proposition, however, does not exonerate either appellee. By and through their omissions, they created a hostile work environment because the threat posed to Appellant was serious and severe, causing Holland to repeat the following in mid-August: "Investigation has found that the threats made by Parolee AR are creditable and very serious that could cause a recognized fear and undue stress to PO Rys and her family. Based on all the facts and the Parolee AR violent history, it is recommended by this investigator that Parole Officer Samantha Rys continue not be his Parole Officer or work in the same borough." JA-528-530.

In short, the conditions that Appellant was subjected to were serious, did involve threats of physical violence and intimidation ,and, while neither appellee was the originator of these threats, both were in positions of responsibility and needed to deal with the threats and assist Appellant feel secure in her employment

40

and existence. Neither did anything of substance to achieve this objective despite agency policies that commanded action.

"In order to establish a hostile work environment claim under Title VII, an appellant must . . . show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Rivera v. Rochester Genesee Reg'l. Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014). Here, Appellant's supervisors' failures to take actions within their capacity to secure her environment altered Appellant's workplace and created an abusive working environment.

Appellees submitted below that any failure to provide Appellant with a safe working environment did not unreasonably interfere with her work. This is at least arguable. Since Johnson did not assign Appellant a partner, Appellant was in the unique situation of going into the field by herself. A.R.'s threats of serious violence, made one month after she started working, caused her understandable consternation and anxiety, but this did not prompt Johnson to assign Appellant a field partner. Nor did this threat cause Davis to equalize the assignments Appellant received.

Of course, the Appellees' lackadaisical response to A.R.s threats caused Appellant psychological harm. Though she assiduously prepared a SVOP, Johnson, her supervisor, did not timely review and process it. This allowed A.R. to walk free

41

on July 19, 2021, causing Appellant further stress. Still, Davis and Johnson had no "plan of action" in place to protect her.

Johnson admitted that she had never seen threats of this sort against a Parole Officer; yet argued below that such threats, when combined with Appellees' non-response, would not reasonably cause "psychological harm." Again, a reasonable jury could otherwise conclude.

## **Point III**

### **A reasonable jury could find Appellees caused Appellant's constructive Discharge.**

To defeat summary judgment on the constructive discharge claim, Appellant must present facts from which a reasonable jury could conclude that her working conditions were intolerable or occurred under circumstances giving rise to an inference of discrimination. *Terry v. Ashcroft*, 336 F.3d 128, 151-52 (2d Cir. 2003). The issue then is whether a reasonable person in Appellant's position would have felt compelled to resign. *Petrisino v. Bell Atl.*, 385 F.3d 210, 229 (2d Cir. 2004).

Central to Appellant's working conditions were three matters: [a] her relationships with others in the workplace; [b] her assignments; and [c] her safety and security. Appellant was shunned by others in the office. None agreed to partner with her during her employment. Her supervisor, who was responsible for assigning her a partner for, *inter alia*, safety reasons, never did so and has not explained why she did not. While Davis testified that doing so was mandatory and Johnson's

42

responsibility, Johnson continues to claim that finding a partner was Appellant's responsibility.

Appellant knew her assignments were more numerous and onerous than opposite-race similarly situated workers. They told her so.

And, contrary to Appellees' formulation below, Appellant's supervisors did not do anything approaching all they could to provide for her security and safety. First, despite knowing that A.R. had threatened Rys, Johnson assigned her to direct contact with A.R. on June 24 at the hospital. Second, Johnson maintained Appellant's responsibility for A.R. until July 23, 2021, ten days after Davis was re-assigned, having never altered appellant's assignment. Third, Davis failed to comply with the agency's own directive and did not develop with Rys, the target, and Holland, any plan of action to deal with the threat A.R. posed. Fourth, Johnson failed to ensure Appellant had a field partner. Fifth, both appellees failed to arrange for Appellant to park in the enclosed garage, a step not taken for five weeks after the event and then by others.

Appellees argue that there is "no evidence" that race played a role in Appellant's treatment. This argument fails. Assume for a moment that there was one African American under a supervisor' direction along with six of seven similarly-titled Caucasians and the African American was not given a partner when all others were, was given more onerous assignments and, after being threatened,

43

was not provided significant support by her supervisor as is expected and directed by the agency's written policies. That employee would have a claim based on the totality of the evidence and would raise an issue for jury determination – whether race played a role in the disparate treatment she endured and the apparent devaluation she suffered.

The same analysis must obtain here. *Ames v. Ohio Dept of Youth Services*, 145 S.Ct. 1540 (2025). Rys was the only Caucasian PO Johnson supervised. She alone was not provided with a field partner, and her assignments were more onerous than others. And, when she was threatened by a person with a violent history, both appellees failed to comply with the agency's standards and threw her back into contact with her assailant, causing her reasonable fear and anxiety.

Finally, there is some comparator evidence available here: it cuts against appellees. Appellant was the only PO under Johnson without a field partner. Appellant was the only PO assigned cases from three precincts. Johnson acknowledged never dealing with the kind of threats A.R. made to Appellant. Accordingly, while there is no comparator, there are written agency policies which were to be applied in this case. But, contrary to her claims, Davis did not timely comply with the directive and never formulated, with Appellant and OSI, any plan of action to abate the threat to appellant's safety and security.

44

## CONCLUSION

Since a reasonable jury could conclude that Appellees subjected Appellant to a racially hostile work environment and that Appellant was constructively discharged because of actions and omissions in which Appellees intentionally engaged, the district court erred in granting Appellees' motion for summary judgment. This court should reverse and remand.

Dated:     Goshen, New York
           July 10, 2025             Respectfully submitted,
                                      SUSSMAN & ASSOCIATES
                                      *Attorneys for Plaintiff-Appellant*

                                      By:  */s/ Michael H. Sussman*
                                           Michae H. Sussman, Esq.
                                           1 Railroad Avenue, Ste. 3
                                           P.O. Box 1005
                                           Goshen, New York 10924
                                           (845) 294-3991 [Tel]
                                           (845) 294-1623 [Fax]
                                           sussman1@sussman.law

## CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,355 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in Time New Roman 14-point type for text and footnotes.

# SPECIAL APPENDIX

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

Opinion and Order Granting Defendant's
Motion for Summary Judgment, dated March 24, 2025 .................................... SA-1

Judgment, dated March 24, 2025 ..................................................................... SA-28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SAMANTHA RYS,

                *Plaintiff*,

     v.

SABRINA DAVIS *and* TANYA JOHNSON,

                *Defendants*.

---

No. 22-CV-10758 (KMK)

OPINION & ORDER

Appearances:
Michael Howard Sussman, Esq.
Sussman & Watkins
Goshen, NY
*Counsel for Plaintiff*

Jessica Michelle Acosta-Pettyjohn, Esq.
New York State Attorney General's Office
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Samantha Rys ("Plaintiff") brings this Action against Sabrina Davis ("Davis") and Tanya

Johnson ("Johnson") (together, "Defendants"), alleging hostile work environment and

constructive discharge on the basis of race in violation of the Equal Protection Clause of the

Fourteenth Amendment and pursuant to 42 U.S.C. § 1983. (*See* Compl. (Dkt. No. 1).) Before

the Court is Defendants' Motion for Summary Judgment (the "Motion"). (Not. of Mot. (Dkt.

No. 25).) For the reasons discussed below, the Motion is granted.

**SA-1**

I. Background

A. Factual Background

The following facts are taken from Defendants' 56.1 Statement, ("Defs' 56.1") (Dkt.

No. 27), Plaintiff's 56.1 Statement, ("Pl's 56.1") (Dkt. No. 29 at 29–34), the Parties'

counterstatements, ((Dkt. No. 29 at 1–29) ("Pl's 56.1 Resp."); (Dkt. No. 36) ("Defs' 56.1

Resp.")), and admissible evidence submitted by the Parties.[1]

_____

[1] Where a Party's denial fails to specifically controvert the fact in question, the fact is admitted to the extent the Court determines that it is supported by admissible record evidence. *See Santander Consumer USA, Inc. v. The City of Yonkers*, No. 22-CV-8870, 2024 WL 4817649, at \*1 n.1 (S.D.N.Y. Nov. 18, 2024) (citing *Mae v. Quickway Estates LLC*, No. 22-CV-3048, 2023 WL 6162927, at \*1 n.2 (S.D.N.Y. Sept. 21, 2023) (deeming facts to which defendant asserted general denials admitted once the Court "scrutinized [p]laintiff's submitted evidence to determine whether the evidence supports [p]laintiff's statements")). Here, Plaintiff fails to specifically controvert a number of Defendants' proposed facts. For example, Defendants submit that Plaintiff's training lasted "for approximately two months." (Defs' 56.1 ¶ 3.) Plaintiff denies this fact and states, in sum: "Deny. Plaintiff completed the Academy on or about May 21 and commenced her assignment in Brooklyn on May 24, 2021." (Pl's 56.1 Resp. ¶ 3 (citation omitted).) This denial does not address, let alone controvert, the length of Plaintiff's training. This pattern continues throughout Plaintiff's response. (*Compare* Defs' 56.1 ¶ 53 ("Johnson would encourage POs to go on the field with partners . . . .") *with* Pl's 56.1 Resp. ¶ 53 ("Deny that Johnson ever encouraged any P.O. to go into the field with Plaintiff . . . ."); Defs' 56.1 ¶ 68 ("Due to A.R.'s threats and his whereabouts being unknown, and at the direction of a BC, Plaintiff was allowed to park in the building's garage.") *with* Pl's 56.1 Resp. ¶ 68 ("She was first permitted to park in the garage on July 30, 2021. Neither Johnson nor Davis arranged this. Rather, this happened after Plaintiff went to another [BC] . . . ."); Defs' 56.1 ¶ 112 ("Following his release, A.R. was ordered to report to the Brooklyn Office, but he absconded and failed to report with no contact with the parole office.") *with* Pl's 56.1 Resp. ¶ 112 ("Deny. A.R. absconded on July 19; there was no safety plan in place for plaintiff.").) Accordingly, the Court will deem admitted those facts that Plaintiff fails to specifically controvert.

Plaintiff's noncompliance with standard summary judgment procedure does not end there. Local Rule 56.1(d) requires that a denial to a proposed undisputed fact "must be followed by citation to evidence that would admissible and set forth as required by [Federal Rule of Civil Procedure] 56(c)." Loc. Civ. R. 56.1(d) (Jan. 2, 2025). Defendants argue that Plaintiff's 56.1 Statement includes proposed undisputed facts that "have no cite or contain Plaintiff's opinion" or "have vague citations with no pin cite." (Defs' Reply. 3.) "Where there are no citations or where the cited materials do not support the factual assertions in the Rule 56.1 Statements, the [C]ourt is free to disregard the assertion." *Dealerwing LLC v. Lerner*, No. 21-CV-6429, 2024 WL 4252497, at \*3 n.4 (S.D.N.Y. Sept. 19, 2024) (alterations adopted) (quoting *Nat'l Coal. on*

2

1. Training and Assignment[2]

Plaintiff was employed by the New York State Department of Corrections and Supervision ("DOCCS") as a Parole Officer ("PO") from approximately May 2021 until her resignation on August 18, 2021. (Defs' 56.1 ¶¶ 1, 126.) Plaintiff underwent training at the "Academy" located in Albany, New York, between March and May 2021. (*Id.* ¶¶ 2–3.) The duties of a PO include monitoring parolees, protecting the community, providing parolees with appropriate resources, and ensuring that the parolee's terms and conditions are met. (*Id.* ¶ 6.) Prior to her training, Plaintiff indicated that she had a preference for assignment to DOCCS locations north of New York City, (*id.* ¶ 4), but was offered the Manhattan office, (Decl. of Jessica Acosta-Pettyjohn ("Acosta-Pettyjohn Decl."), Ex. A ("Pl's Dep. Tr.") at 45:6–21; *see also* Defs' 56.1 ¶ 9). During training, Plaintiff was informed that she was assigned to the Brooklyn Office. (Defs' 56.1 ¶ 7.) At the direction of Senior Parole Officer ("SPO") Hamilton, Plaintiff wrote a memo seeking to have DOCCS honor her Manhattan offer. (*Id.* ¶ 9.) During training, both SPO Hamilton and a training instructor informed Plaintiff that she would "stick out in the Brooklyn Office" and that the "Brooklyn Office would be an adjustment for her." (*Id.* ¶¶ 72–73.)

_____

*Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78, 107 (S.D.N.Y. 2023)); *see also Finnegan v. Berben*, No. 20-CV-10231, 2024 WL 1242996, at *1 n.2 (S.D.N.Y. Mar. 22, 2024) (same). Accordingly, the Court will disregard those paragraphs that have no citation to the record. (*See* Pl's 56.1 ¶¶ 7, 8, 21.) In the future, failure by counsel to follow the rules, which apply to all attorneys appearing in this District, will result in sanctions directed at counsel.

[2] The Court notes that the Parties spend time discussing Plaintiff's training and assignment to the Brooklyn Office. (*See* discussion infra Section I.A.1.) However, because neither Johnson nor Davis played any role in Plaintiff's assignment to Brooklyn, (*see* Defs' 56.1 ¶ 23), or in her training, (*see id.* ¶¶ 2–6 (failing to mention Defendants in any capacity with reference to Plaintiff's training)), these facts are largely irrelevant to Plaintiff's case.

3

**SA-3**

Plaintiff's first day at the Brooklyn Office was May 24, 2021. (*Id.* ¶ 10.) Plaintiff's commute to the Brooklyn Office took approximately two to four hours each way. (*Id.* ¶ 8.) Plaintiff was supervised by Johnson, a SPO, who in turn reported to Davis, a Bureau Chief ("BC"). (*Id.* ¶ 22.) At 12:15 AM on her first day, Plaintiff submitted a P3 Transfer Form to DOCCS Human Resources, in which she requested a transfer to the Manhattan office because her Brooklyn assignment was a mistake, she had a high score on the PO exam, she had a long commute, and Manhattan was closer to her daughter's graduate school. (*Id.* ¶ 11–12.) Plaintiff requested transfer to five locations, all north of New York City. (*Id.* ¶ 19.) DOCCS employees can only be transferred upon completing training and reporting to their assignment work location, (*id.* ¶ 15), and need not secure supervisor sign off on transfer requests, (*id.* ¶ 20). The deadline to submit a P3 Transfer Form was March 31, 2021. (*See id.* ¶ 17.) Employees requesting a transfer after the deadline are put on waitlists for their requested locations. (*See id.* ¶¶ 17, 19.) At a meet and greet on her first day, Plaintiff informed others that she did not know if she was supposed to be in the Brooklyn Office. (*Id.* ¶ 21.) On June 15, 2021, Plaintiff discussed her commute and transfer with Johnson, who instructed Plaintiff to contact personnel and submit a P3 form. (*Id.* ¶ 25.)

  2.  Partner Assignment

The Parties dispute the nature of partner assignment. Defendants submit, and Plaintiff admits, that POs are assigned training partners. (*See id.* ¶ 42; Pl's 56.1 Resp. ¶ 42.) Defendants also submit that "[a] PO can ask any other PO to partner with them to go in the field, but it is not required and is at the discretion of the POs," (Defs' 56.1 ¶ 52), but Plaintiff denies this statement and claims that "[a]ll the POs in the office were assigned partners" and that she "was never given a partner and was forced to go in the field alone," (Pl's 56.1 Resp. ¶ 52). Plaintiff's denial and

her briefing indicate, at best, a misunderstanding or, at worst, a willful misrepresentation of how partnering worked in the Brooklyn Office. The record evidence demonstrates that there are three types of partners: training, office, and field. Upon a parole officer's arrival at the Brooklyn Office, they are assigned a partner for on-the-job training. (Pl's 56.1 ¶ 41; *see also* Pl's Dep. Tr. at 80:8–19 ("They assigned you with a parole officer that may have been there before you . . . and you learned from them.").) This is also referred to as being assigned a partner for "field training." (*See* Defs' 56.1 ¶ 42; *see also* Acost-Pettyjohn Decl., Ex. B ("Davis Dep.") (Dkt. No. 26-2) at 51:8–52:12; 56:16–22.) Training partners are assigned by the BC. (*See* Davis Dep. Tr. at 53:23–57:4; Acosta-Pettyjohn Decl., Ex. C ("Johnson Dep.") (Dkt. No. 26-3) at 15:13–15.) Field training is usually conducted over the course of a new parole officer's first two weeks, (Pl. Dep. Tr. at 81:8–18), but Plaintiff's field training was shorter than two weeks because she was ill during this time, (*id.* 80:25–81:7). Parole officers are assigned office partners "for office coverage" such that, if a parole officer is absent, their office partner can handle "something [that] arises on [the absent officer's] caseload." (*See* Johnson Dep. Tr. at 71:12–20.) Finally, parole officers are *encouraged* "to go out in the field with a partner," (Johnson Dep. Tr. at 71:2–7), "as an overall safety concern, . . . just in case a parole officer may need assistance with themselves or with the individual that's out in the community," (*id.* 73:9–14).

On one occasion, Plaintiff asked PO Patricia Brown ("Brown" or "PO Brown") to accompany her, but Brown said she would not travel with Plaintiff unless she got a spray tan and hat "because there's no reason a white person goes down [to a particular neighborhood] unless they're arresting you or taking your kids." (Pl's 56.1 Resp. ¶ 57.) Plaintiff did not report this comment to either Johnson or Davis. (*Id.* ¶ 58.) On another occasion, Plaintiff asked two other POs to travel to a location in which she felt was unsafe; the POs were annoyed by Plaintiff's

request but agreed to accompany her.  (*Id.* ¶ 55.)  Plaintiff asked if one of the other POs could drive because she had a three-and-a-half-hour commute that morning, but the other POs refused. (*Id.*)  Plaintiff reported this incident to Johnson, who suggested that Plaintiff ask a different PO to accompany her on fieldwork.  (*Id.* ¶ 56.)  Plaintiff made no complaints to Davis about partnering with other POs.  (*Id.* ¶ 60.)

    3.  Workload

The BC assigns cases to POs by police precinct.  (Defs' 56.1 Resp. ¶ 16–17.)  The number of POs assigned to a geographical region is determined by the number of parolees residing in that region.  (Pl's 56.1 Resp. ¶ 63.)  A PO can expect to have between 25 and 70 assigned cases.  (*Id.* ¶ 65.)  Plaintiff asserts that she was assigned three precincts, while none of the other African American POs was assigned more than two.  (Pl's 56.1 ¶ 19.)[3]  Plaintiff also asserts that other POs noted her more onerous assignment.  (*Id.* ¶ 20 (citing a fellow PO's note on a greeting card presented to Plaintiff on the occasion of her departure from the Brooklyn Office).)

_____

[3] Plaintiff asserts that "Davis has never denied that [P]laintiff was assigned three precincts while similarly situated African American parole workers were assigned . . . ."  (Pl's 56.1 ¶ 21.)  Plaintiff cites no record evidence in support of this fact.  Local Rule 56.1(d) clearly provides that "[e]ach statement by the movant or opponent under Rule 56.1(a) and (b) . . . must be followed by citation to evidence that would be admissible . . . ."  Local Civ. R. 56.1(d).  In this circumstance, the Court would consider such a fact only "to the extent it is undisputed by Defendants."  *Melvin v. County of Westchester*, No. 14-CV-2995, 2019 WL 1227903, at *1 n.1 (S.D.N.Y. Mar. 15, 2019).  Because this fact is disputed by Defendants, the Court will not consider it.  *See Moschetti v. New York City Dep't of Educ.*, No. 15-CV-3161, 2018 WL 4759787, at *1 n.1 (S.D.N.Y. Sept. 28, 2018) (noting that the Court "need not consider the unsupported facts in the [56.1] counter statements.").

4.  Parolee A.R.

On or about June 9, 2021, Plaintiff was assigned to supervise parolee A.R.  (Defs' 56.1 ¶ 81.)  On or about June 16, 2021, A.R. was arrested while residing at a shelter, which in turn required Plaintiff to write a violation of parole ("VOP") against A.R.  (*Id.* ¶¶ 83–84.)  On June 22, 2021, Plaintiff spoke to A.R. and asked him to report to the Brooklyn Office at 10:00 AM the following day.  (*Id.* ¶ 85.)  On June 23, 2021, A.R. did not make his appointment and instead arrived at the office after Plaintiff had left for the day, at which time he threatened other POs who he believed might be Plaintiff.  (*Id.* ¶¶ 86–87.)  A.R. was arrested and transported to a hospital for an evaluation after he threatened self-harm.  (*Id.* ¶¶ 88–89.)

On June 24, 2021, Johnson, with Davis' knowledge, directed Plaintiff to perform hospital duty because A.R. was assigned to Plaintiff.  (*Id.* ¶ 90; Pl's 56.1 ¶ 27.)  The Parties dispute whether Plaintiff's hospital duty contravened DOCCS custom and practice to separate a PO and parolee when the parolee has threatened the PO.  (*See* Defs' 56.1 Resp. ¶ 28.)  Upon meeting Plaintiff, A.R. screamed, yelled, and made threats of sexual and homicidal violence against Plaintiff and her family.  (Pl's 56.1 ¶ 29; Defs' 56.1 ¶¶ 92–93.)  Plaintiff called Johnson, informed her of A.R.'s threats, and requested she be taken off hospital duty, to which Johnson agreed.  (Def's 56.1 ¶ 96.)  Upon returning to the Brooklyn Office from the hospital, Plaintiff and Johnson spoke about the incident and Plaintiff completed an unusual incident report.  (*Id.* ¶¶ 98–99.)  Johnson immediately discussed the incident with Davis.  (Defs' 56.1 Resp. ¶ 25.)

On June 25, 2021, DOCCS Office of Special Investigations ("OSI") Investigator Holland began an investigation into the incidents regarding A.R and recommended to Davis that Plaintiff "be removed from [A.R.] and another PO should be assigned [to A.R.]"  (Pl's 56.1 Resp. ¶ 103; Defs' 56.1 Resp. ¶ 35.)  The Parties dispute whether Johnson received Holland's June 25

7

**SA-7**

recommendations. (*See* Pl's 56.1 Resp. ¶ 122.) That day, Davis requested that Plaintiff file a police report regarding the incident in the hospital. (*Id.* ¶ 104.)

On July 19, 2021, Plaintiff appeared at a virtual hearing regarding A.R.'s arrest at the shelter. (*Id.* ¶ 109–10.) The Parties dispute whether it is customary or required by DOCCS policy that, following a parolee's threatening a PO, that the PO must still attend the parolee's VOP hearing. (*See id.* ¶ 116–17.) That day, A.R.'s VOP as it related to the shelter arrest was dismissed and he was released from custody. (*Id.* ¶ 111.) A.R. was ordered to report to the Brooklyn Office, but "absconded" and had no contact with the parole office. (*Id.* ¶ 112.) On or about July 23, 2021, A.R. was removed from Plaintiff's caseload. (*Id.* ¶ 114.)

On July 29, 2021, Davis, who no longer worked at the Brooklyn Office, forwarded an email from Investigator Holland to BC Granum, Davis' replacement. (*Id.* ¶ 118.) On July 30, 2021, in consideration of her safety, Plaintiff was permitted to park in the Brooklyn Office's garage, which was usually reserved for other employees and not POs. (*Id.* ¶ 67; Defs' 56.1 Resp. ¶ 53.) On August 12, 2021, Investigator Holland submitted his final report which recommended that Plaintiff should neither be A.R.'s PO nor work in the same borough as A.R. (Pl's 56.1 Resp. ¶ 120.) On August 18, 2021, Plaintiff submitted her resignation letter effective August 20, 2021. (*Id.* ¶ 126.)

B. Procedural Background

Plaintiff initiated this Action on December 21, 2022. (*See* Compl.) The matter was referred to mediation, (*see* Dkt. No. 15), which was unsuccessful, (*see* Dkt. No. 19). On May 20, 2024, Defendants filed their Motion for Summary Judgment. (*See* Not. of Mot.; Defs' Mem. in Supp. ("Defs' Mem.") (Dkt. No. 28); Defs' 56.1.) On June 20, 2024, Plaintiff filed her Opposition. (*See* Pl's Mem. in Opp. ("Pl's Opp.") (Dkt. No. 31); Pl's 56.1 Resp.; Pl's 56.1.) On

July 12, 2024, Defendants replied.  (*See* Defs' Reply in Supp. ("Defs' Reply") (Dkt. No. 35); Defs' 56.1 Resp.)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same); *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration, citation, and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts

showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323–24).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule

10

**SA-10**

56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (citation omitted)).

If "any portion of an affidavit [is] not based on personal knowledge[, it] should be stricken." *Gemological Inst. of Am., Inc. v. Zarian Co.*, 349 F. Supp. 2d 692, 697 (S.D.N.Y. 2004) (quoting *Larouche v. Webster*, 175 F.R.D. 452, 454–55 (S.D.N.Y. 1996)); *see also Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 131 n.12 (2d Cir. 2004) (noting that the district court was free to disregard hearsay statements and speculation in affidavits); *Baity*, 51 F. Supp. 3d at 419 (disregarding "statements not based on [the] [p]laintiff's personal knowledge"). As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"). However,

> where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.

*Jeffreys*, 426 F.3d at 554 (citation omitted).

"[W]here [there is] nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony" and "no reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in

11

**SA-11**

[plaintiff's complaint]," the court may grant a defendant's motion for summary judgment. *Roland v. City of New York*, No. 20-CV-5392, 2024 WL 2832691, at *20 (S.D.N.Y. June 3, 2024) (citing *Jeffreys*, 426 F.3d at 555). *Jeffreys*, however, is inapposite where a plaintiff's "testimony [is] consistent and uncomplicated." *See Bellamy v. City of New York*, 914 F.3d 727, 746 (2d Cir. 2019). In other words, a plaintiff's consistent, uncomplicated, and not "wholly improbable" testimony "may be independently sufficient to raise a genuine issue of material fact." *Id.* (citing *Rentas v. Ruffin*, 816 F.3d 214, 221 (2d Cir. 2016)); *see also Lara v. Port Auth. of New York and New Jersey*, No. 20-CV-10383, 2023 WL 2185853, at *6 (S.D.N.Y. Feb. 23, 2023) (finding that plaintiff's testimony, "[w]hile admittedly lacking specificity and rather thin," was nonetheless sufficient to defeat defendant's motion for summary judgment); *Drayton v. City of New York*, No. 17-CV-7091, 2021 WL 1163108, at *2–3 (E.D.N.Y. Mar. 26, 2021) (denying a motion for reconsideration of the court's earlier ruling that plaintiff's deposition testimony raised a triable issue of fact that survived summary judgment).

The Second Circuit has stated repeatedly that "an extra measure of caution is merited before granting . . . summary judgment in a discrimination action because direct evidence of discriminatory intent is rare." *See Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 228 (2d Cir. 2024) (quotation marks omitted). Because discriminatory intent is "elusive" in nature, *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015), "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination," *Banks*, 81 F.4th at 259 (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)). That said, a plaintiff's "'reliance upon conclusory statements or mere allegations' will not suffice to defeat summary judgment." *Moll*, 94 F.4th at 228 (quoting *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002)). Summary judgment remains proper when "the

nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* (quoting *Celotex*, 477 U.S. at 322–23).

B.  Analysis

In Opposition to Defendants' Motion, Plaintiff submitted a declaration.  (Decl. of Samantha Rys ("Pl's Decl.") (Dkt. No. 32).)  Defendants argue that Plaintiff's declaration "contradicts her deposition testimony" and was made "solely to create issues of fact to avoid the granting of summary judgment."  (*See* Defs' Reply 3–5.)  Courts note that "a non[-]moving party's self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment."  *Adler v. Penn Credit Corp.*, No. 19-CV-7084, 2022 WL 744031, at *9 (S.D.N.Y. Mar. 11, 2022) (quoting *Wheeler v. Kolek*, No. 16-CV-7441, 2020 WL 6726947, at *8 (S.D.N.Y. Nov. 16, 2020)).  Such self-serving declarations are also insufficient to create a genuine dispute of fact.  *See Cestaro v. Prohaska*, 681 F. Supp. 3d 121, 125 (S.D.N.Y. July 7, 2023) ("A conclusory contradiction of undisputed evidence in a self-serving affidavit, unsupported by other evidence, is not by itself sufficient to create a genuine dispute of material fact." (citation omitted)).  "Under the sham affidavit rule, 'a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.'" *Catalyst Advisors, LP v. Catalyst Advisors Invs. Glob. Inc.*, No. 21-CV-4855, 2024 WL 522751, at *11 (S.D.N.Y. Feb. 9, 2024) (quoting *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)).

Plaintiff's declaration qualifies as a sham affidavit because she attempts to create factual disputes that contradict her previous testimony.  For example, Plaintiff testified that she was not aware of her fellow PO's caseloads, (*see* Pl's Dep. Tr. at 166:7–14 ("Q: . . . [D]o you know what

13

**SA-13**

everybody else's caseload looked like?  A:  I kept things in my lane.  I don't do that."), but now declares that she "was assigned three police precincts" and that "African American parole officers were assigned or two, most usually two," (Pl's Decl. ¶ 7).  Plaintiff's assertion as to the workload of Black coworkers is undermined by her disclaiming such knowledge in her deposition.  Plaintiff's declaration is further undercut by her testimony that she was assigned *two* precincts, not three as she claims in her declaration.  (*Compare* Pl's Dep. Tr. at 84:11–17 ("Q: And is it your understanding that all the parole officers in the Brooklyn office had parolees within all five boroughs?  A:  Yes.  My jurisdiction had two precincts though . . . which was different.") *with* Pl's Decl. ¶ 7 ("I was assigned three police precincts.").)  Plaintiff also testified as to a single instance in which racial comments were directed at her when her coworker, PO Brown, said she would not accompany Plaintiff "unless [she] get[s] a spray tan and a hat."  (Pl's Dep. Tr. at 157:12–158:8.)  In her declaration, Plaintiff now claims there were "two occasions" in which "African American POs declined to partner with [her] for what they express were race-based reasons"—the spray tan comment and an instance in which "[a]nother [parole officer] yelled to [Plaintiff] on the stairwell that [she] was a 'snow cone' and that going in the field where [she] was assigned would not be safe."  (Pl's Decl. ¶ 6.)  There is no mention of the snow cone incident or the parole officer who made that comment in Plaintiff's deposition.  (*See generally* Pl's Dep. Tr.)  Plaintiff testified that she only reported one instance of parole officers treating her poorly, (*see id.* 160:4–11 ("Q:  . . . Did you report anything else with—to S.P.O. Johnson regarding any treatment you received from the other parole officers?  A:  I did not.  It was just the whole—it wasn't like, it was the feeling of the entire office.  It's kind of like the feeling I got from [Defendants] as well.  You're not always—it's not always verbal."; *id.* 159:16–21 ("Q:  . . . Did you report [PO Brown saying Plaintiff needed a spray tan] to [Defendants]?  A:  I did not.")):

14

**SA-14**

when Plaintiff's fellow parole officers who accompanied her in the field "were so angry and . . . didn't talk to [Plaintiff] almost the entire day," (Pl's Dep. Tr. at 156:14–19). In her declaration, however, Plaintiff stated that she "viewed not having a partner as being all about [her] race" and that she "repeatedly raised [the] issue with Johnson about having to go out alone, without a partner, and asked for her assistance in that regard." (Pl's Decl. ¶ 10).

"Courts in the Second Circuit are particularly reluctant to credit affidavit testimony that alleges critical, obviously material facts that were not mentioned at deposition, noting that such circumstances strongly suggest a sham affidavit." *Chen v. Matsu Fusion Rest. Inc.*, No. 19-CV-11895, 2022 WL 3018105, at *4 (S.D.N.Y. July 29, 2022) (quoting *Golden v. Merrill Lynch & Co.*, No. 06-CV-2970, 2007 WL 4299443, at *9 (S.D.N.Y. Dec. 6, 2007)). In short, Plaintiff submits a declaration that pointedly contradicts her deposition testimony in an attempt to bolster her claims of disparate treatment, discussed infra Section II.B.1. This strongly suggests that Plaintiff's declaration is a sham affidavit, as opposed to one that merely "clarifie[s] and elaborate[s] on factual details provided in her earlier testimony." *Burgess v. Costco Wholesale Corp.*, No. 21-CV-5178, 2024 WL 4333617, at *4 n.13 (S.D.N.Y. Sept. 27, 2024) (alterations adopted) (quoting *Wongsing v. Wal-Mart Real Est. Bus. Tr.*, No. 20-CV-6029, 2021 WL 5304310, at *7 (S.D.N.Y. Nov. 15, 2021)), *appeal pending*, No. 24-CV-2816 (2d Cir. Oct. 24, 2024). Because Plaintiff's declaration qualifies as a sham affidavit, the Court concludes that Plaintiff cannot rely on the declaration to raise disputed issues of material fact. As such, the Court will not credit Plaintiff's new allegations as described above that contradict her deposition testimony. *See Chichinadze v. BG Bar Inc.*, 517 F. Supp. 3d 240, 250 (S.D.N.Y. 2021) (finding that the non-movant's declaration was a sham affidavit because it contradicted prior deposition testimony); *see also Jablonski v. Special Counsel, Inc.*, No. 16-CV-5243, 2025 WL 315884, at

15

**SA-15**

*5 (S.D.N.Y. Jan. 27, 2025) (striking specific assertions from a sham declaration because those assertions contradicted the declarant's deposition testimony); *Chen*, 2022 WL 3018105, at *4 (disregarding new allegations in plaintiffs' affidavits where the "affidavits plainly qualify as sham affidavits"); *see also Kim v. DK Cosms.*, No. 19-CV-9079, 2022 WL 540675, at *3 (S.D.N.Y. Feb. 23, 2022) (disregarding an affidavit pursuant to the sham affidavit doctrine).

### 1.  Hostile Work Environment

Section 1983 provides a cause of action against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  "Of course, [Section] 1983 'is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes.'"  *Soso v. New York City Dep't of Educ.*, No. 21-CV-4660, 2023 WL 2667048, at*5 (E.D.N.Y. Mar. 28, 2023) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).  Relevant here, the Equal Protection Clause of the Fourteenth Amendment guarantees the right to be free from discrimination, including a hostile work environment.  *See Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006); *Butts v. New York City Dep't of Educ.*, No. 22-CV-4418, 2024 WL 4350430, at *6 (E.D.N.Y. Sept. 30, 2024) (same).

A Section 1983 claim has two essential elements:  "(1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges."  *Sareen v. Port Auth. of New York & New Jersey*, No. 12-CV-2823, 2013 WL 6588435, at *12 (S.D.N.Y. Dec. 16, 2013) (alteration rejected) (quoting *Annis v. County of Westchester*, 136 F.3d 230, 245 (2d Cir. 1998)),

*aff'd sub nom. Sareen v. The Port Auth. of New York & New Jersey*, 592 F. App'x 34 (2d Cir. 2015); *see also Lucien v. Williams*, No. 20-CV- 8020, 2023 WL 2648215, at *8 (S.D.N.Y. Mar. 27, 2023) (same).

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under [Section] 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Veras v. Jacobson*, No. 18-CV-6724, 2022 WL 2133842, at *5 (S.D.N.Y. June 14, 2022) (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (collecting cases)). "A plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Zeigler v. Annucci*, No. 23-CV-707, 2024 WL 4252682, at *7 (S.D.N.Y. Sept. 20, 2024) (alteration adopted) (quoting *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quotation marks omitted) (explaining that "a plaintiff may not rely on a special test for supervisory liability")). Based on that requirement, the Second Circuit has recognized five theories of personal involvement for supervisory officials:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Haughey v. Cnty. of Putnam*, No. 18-CV-2861, 2022 WL 4468066, at *17 (S.D.N.Y. Sept. 26, 2022) (quoting *Grullon*, 720 F.3d. at 139 (alterations, italics, and quotation marks omitted)).

"In order to establish a hostile work environment claim . . ., a plaintiff must produce evidence that the complained of conduct '(1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an

17

**SA-17**

environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's . . . protected characteristic.'" *Russo v. New York Presbyterian Hosp.*, 972 F. Supp. 2d 429, 446 (E.D.N.Y. 2013) (internal quotation marks omitted) (quoting *Robinson v. Harvard Prot. Servs.,* 495 F. App'x. 140, 141 (2d Cir.2012) (summary order) (quoting *Patane v. Clark,* 508 F.3d 106, 113 (2d Cir.2007))).[4] "In determining whether a work environment is hostile, [the] Court must consider the totality of the circumstances, which includes: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Gamble v. Fieldston Lodge Nursing & Rehab. Ctr.*, No. 20-CV-10388, 2022 WL 1778488, at *2 (S.D.N.Y. June 1, 2022) (quotation marks omitted) (quoting *Reyes v. Westchester Cnty. Health Care Corp.*, No. 21-410, 2021 WL 4944285, at *3 (2d Cir. Oct. 25, 2021) (summary order)).

Defendants argue that the alleged conduct was neither severe nor pervasive and that Plaintiff has not established that the alleged conduct occurred because of Plaintiff's race. (Defs' Mem. 13–19.) Plaintiff counters that the totality of circumstances, including assignment of partners, disparate workload, and Defendants' alleged failure to timely reassign A.R. to another PO, resulting in feeling unsafe, establishes a hostile work environment. (Pl's Opp. 5–11.)

First, there is no real dispute as to whether Defendants acted under color of state law because they are state employees, and "a public employee generally acts under color of state law

---

[4] "The standard for hostile work environment claims under Title VII, [Section] 1981, [Section] 1983, and the NYSHRL is the same." *Lamarr-Arruz v. CVS Pharmacy, Inc.*, 271 F. Supp. 3d 646, 655 n.6 (S.D.N.Y. 2017) (quoting *Lewis v. Roosevelt Island Operating Corp.*, 246 F.Supp.3d 979, 989 n.5 (S.D.N.Y. 2017) (collecting cases)). "Cases interpreting hostile work environment claims under these provisions are generally cited interchangeably." *Id.*

18

**SA-18**

while acting in his official capacity or while exercising his responsibilities pursuant to state law."
*Roches-Bowman v. Evans*, 749 F.Supp.3d 479, 487 (S.D.N.Y. 2024) (alterations adopted)
(quoting *Savarese v. City of New York*, 547 F. Supp. 3d 305, 337 (S.D.N.Y. 2021) (quoting *West
v. Atkins*, 487 U.S. 42, 50 (1988))).  Because the alleged conduct was made possible only
through Defendants' authority as state employees who were Plaintiff's supervisors, the Court
finds for the purposes of the following analysis that Defendants acted under color of state law.
*See Feingold v. New York*, 366 F.3d 138, 144, 159 (2d Cir. 2004) (noting that the plaintiff "ha[d]
shown that the deprivations he allege[d] were under color of state law because they were
committed by state employees acting in their official capacities as [state] employees and
exercising their responsibilities pursuant to state law").  "Once action under color of state law is
established, the analysis for such claims is similar to that used for employment discrimination
claims brought under Title VII." *Sareen*, 2013 WL 6588435, at *12 (quoting *Demoret*, 451 F.3d
at 149)).

To carry her burden on hostile work environment, Plaintiff must demonstrate that the
conduct giving rise to the alleged hostile work environment occurred *because* she is Caucasian.
*See Petrisch v. HSBC Bank USA, Inc.*, No. 07-CV-3303, 2013 WL 1316712, at *12 (E.D.N.Y.
Mar. 28, 2013); *see also Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d
Cir. 2014) ("Of course, 'it is axiomatic that mistreatment at work, whether through subjection to
a hostile environment or through other means, is actionable under Title VII only when it occurs
because of an employee's . . . *protected characteristic*,' such as race or national origin."
(alterations adopted) (emphasis added) (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir.
2001))); *Mercado v. Mount Sinai Beth Israel*, No. 21-CV-10467, 2023 WL 5975322, at *10
(S.D.N.Y. Sept. 14, 2023) (same).  Plaintiff points to three alleged instances of hostility:  that

Johnson assigned partners to all Black parole officers except Plaintiff, (*see* Pl's Opp. 7; Pl's 56.1 ¶¶ 5–8, 15); that Plaintiff's workload was more onerous than that of non-Caucasian parole officers, (*see* Pl's Opp. 7–8; Pl's 56.1 ¶¶ 16–21); and that Defendants deviated from established policies concerning Plaintiff's safety in the face of threats from A.R., (*see* Pl's Opp. 8; Pl's 56.1 ¶¶ 28, 35–37, 40–45).  Plaintiff's allegations concerning partner assignment and workload are examples of disparate treatment, while her allegation concerning her safety as it relates to A.R. is facially neutral.  The Court addresses these instances in turn and finds that Plaintiff has failed to carry her burden because she has not shown that the alleged conduct occurred because she is Caucasian.

As discussed above, there are three kinds of partners:  training, office, and field.  *See* supra Section I.A.2.  The undisputed evidence indicates that Defendants assigned training partners, (*see* Johnson Dep. Tr. at 15:13–15 ("Q:  Who assigned the field training officer to the individual trainee?  A:  The bureau chief.")), and office partners, (*see id*. at 71:2–6 ("Q:  Well, in the supervision that you did of the parole officers, did the parole officers have partners?  A:  Partners are assigned for office coverage . . . .")), but *not* field partners, (*see id.* at 71:6–7 (" . . . I always *encourage* officers to go out in the field with a partner.") (emphasis added)). Plaintiff was assigned a training partner whose name she did not recall.  (*See* Pl's Dep. Tr. at 80:20–23 ("Q: And do you remember who your . . . training officer was?  A:  Yes, but I can't remember her name right now.").)  Plaintiff complains that Johnson did not assign her a field partner.  (*See* Pl's Opp. 7; *see also* Pl's 56.1 ¶ 10 ("Johnson knew [P]laintiff did not have a partner, but did not assign her one and, instead, told her to find one herself.").)  It is undisputed, however, that Johnson assigned office partners, but not field partners.  (*See, e.g.*, Defs' 56.1 Resp. ¶ 9.)  That other parole officers either did not want to go into the field with Plaintiff or conditioned their

willingness to accompany Plaintiff in the field on Plaintiff's driving, does not establish discriminatory conduct *by Defendants*.

It is undisputed that a parole officer can expect to have between 25 and 70 cases, (Defs' 56.1 ¶ 65), that parole officers are assigned certain precincts and manage cases that arise within those precincts, (*id.* ¶ 62; Pl's 56.1 ¶ 18), and that the number of parole officers "assigned to a geographical region is determined by the number of parolees residing in that region," (Defs' 56.1 ¶ 63). "Allegations of a heavier workload alone can support a viable hostile work environment claim if the plaintiff was subjected to disproportionately burdensome work assignments." *Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 466 (S.D.N.Y. 2023) (alterations adopted) (quotation marks omitted) (quoting *Wilson v. Family Dollar Stores of N.Y., Inc.*, No. 06-CV-639, 2008 WL 4426957, at *8 (E.D.N.Y. Sept. 25, 2008)). Plaintiff, however, points to no record evidence that she was assigned more *cases* than her Black co-workers. Rather, she claims that she was assigned three precincts, whereas her Black co-workers each had a maximum of two. (*See* Pl's 56.1 ¶ 19.) As discussed above, Plaintiff's claim that she was assigned three precincts is undermined by her own testimony and is not credited by the Court. *See* supra Section II.B. Even if the Court did credit this statement, the number of assigned precincts does not establish that Plaintiff had a disproportionately burdensome work assignment than her Black co-workers because she may have had fewer cases on average per precinct. The only support that Plaintiff musters is a farewell card in which an unidentified colleague says that she has "nightmares about the 76, 78, 84. LOL," (*see* Pl's Decl., Ex. 1 (Dkt. No. 32-1)), and her belief that she had the "most undesirable caseload" because of conversations she had with and remarks by her co-workers, (*see* Pl's Dep. Tr. at 165:20–166:6). Plaintiff's belief as to her workload is undermined by her testimony that she did not know how many cases her Black co-

21

**SA-21**

workers had, (*see* Pl's Dep. Tr. at 166:11–14 (Q: . . . And did you—do you know what everybody else's caseload looked like?  A:  I kept things in my lane.  I don't do that.")), and by her admission that she "did not know the specific names and cases" that other parole officers had, (Pl's 56.1 Resp. ¶ 66).  As for the farewell card, it is difficult to credit Plaintiff's conclusory assertion that the comment references Plaintiff's assigned precincts when she testified that she did not recall her assigned precincts' numbers.  (*See* Pl's Dep. Tr. at 84:22–25.)  Even if the Court takes Plaintiff at her word, she neither testifies nor avers that the individual who wrote the comment was a parole officer or explains why Plaintiff's caseload gives the coworker nightmares.  That Plaintiff's precincts gave a coworker nightmares simply does not establish that Plaintiff had more cases than her Black co-workers.  At bottom, even if the Court adopts all the factual and logical assumptions that Plaintiff makes, Plaintiff has still failed to demonstrate that her workload was more onerous *in comparison* to that of her Black co-workers.  The complete lack of any evidence as to the number of cases that Plaintiff or any of her Black co-workers had is fatal to a hostile work environment premised on disproportionate workload.  *See Jaggon v. Community Health Servs., Inc.*, No. 18-CV-458, 2019 WL 4414953, at *10 (D. Conn. Sept. 16, 2019) (granting summary judgment as to a hostile work environment claim where plaintiff "provides no testimony or admissible evidence suggesting that the workload he was assigned was extraordinarily severe[,] [n]or does he testify as to the duration of the heavy workload he was allegedly assigned."); *Fiorillo v. United Techs. Corp.*, No. 13-CV-1287, 2016 WL 1118789, at *20 n.18 (D. Conn. Mar. 21, 2016) (granting summary judgment on a hostile work environment claim in part because plaintiff "fail[ed] to offer any advice for [his] belief" that "the workload was not evenly distributed and that one of her colleagues who received less work was a male[.]").

Finally, Plaintiff's claim that Defendants deviated from policy as it relates to A.R.'s threats is facially neutral. Facially neutral incidents may be considered among the totality of circumstances that courts consider in any hostile work environment claim, provided that Plaintiff offers "some circumstantial or other basis for inferring that incidents race-neutral on their face were in fact discriminatory." *Tassy v. Buttigieg*, 51 F.4th 521, 533 (2d Cir. 2022) (quoting *Pucino v. Verizon Wireless Commc'ns*, 618 F.3d 112, 117–18 (2d Cir. 2010)); *see also Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89, 121 (S.D.N.Y. 2022) (same (citing *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002))). For example, "when the same individuals engage in some harassment that is explicitly discriminatory and some that is not, the entire course of conduct is relevant to a hostile work environment claim." *Abalola v. St. Luke's-Roosevelt Hosp. Ctr.*, No. 20-CV-6199, 2022 WL 973861, at *11 (S.D.N.Y. Mar. 30, 2022) (internal quotations and citations omitted). Plaintiff points to only one instance in which her race was referenced in the Brooklyn Office—when PO Brown refused to be Plaintiff's field partner unless Plaintiff got a spray tan—and it is undisputed that Plaintiff did not inform Defendants of this incident. (Defs' 56.1 ¶ 58.) As discussed above, *see* supra Section II.B, the Court will not consider the "snow cone" incident that Plaintiff brings up only in her declaration. Plaintiff has not made any attempt to demonstrate Defendants' personal involvement in the comments made by her fellow parole officers that referenced Plaintiff's race, or that they were grossly negligent, or that Defendants were informed and failed to remedy the wrong. *See Zeigler*, 2024 WL 4252682, at *7 (setting out the five recognized theories of personal involvement for supervisory officials). Accordingly, because Plaintiff has not made the requisite showing, Defendants cannot be found liable for that, or any other, inappropriate comment by Plaintiff's coworkers. *See id.* at *11 (dismissing claim against a supervisory defendant where plaintiff failed to make the requisite showing of liability);

23

**SA-23**

*Gelin v. Geithner*, No. 06-CV-10176, 2009 WL 804144, at *25 (S.D.N.Y. Mar. 26, 2009) (granting summary judgment on a hostile work environment claim where plaintiff failed to "present[] any reason to impute [coworker's] alleged conduct to [defendant employer]."), *aff'd*, 376 F. App'x 127 (2d Cir. 2010).  None of Plaintiff's other allegations regarding Defendants' handling of the A.R. situation touch on race.  (*See* Pl's 56.1 ¶¶ 22–53.)  And Plaintiff simply does not make a coherent argument that Defendants' facially neutral handling of the A.R. situation was accompanied by circumstantial evidence of race-based discrimination.  (*See* Pl's Opp. 5–12.)  To the extent Plaintiff argues that her being the only Caucasian in the Brooklyn Office suffices to infer race-based discrimination, this argument also fails.  Courts regularly hold that "being the only member of a protected class in a department does not give rise to an inference of discrimination."  *Xu v. New York City Dep't of Health & Mental Hygiene*, No. 08-CV-11339, 2020 WL 8671952, at *34 (S.D.N.Y. Dec. 22, 2020) (citing *Watson v. Arts & Entertainment Television Network*, No. 04-CV-1932, 2008 WL 793596, at *17 n.5 (S.D.N.Y. March 26, 2008) (collecting cases), *aff'd*, 352 F. App'x 475 (2d Cir. 2009)), *report and recommendation adopted*, 2021 WL 1222119 (S.D.N.Y. Mar. 31, 2021); *see also Sosa v. Rockland Cnty. Cmty. Coll.*, No. 15-CV-3329, 2017 WL 3105872, at *5 (S.D.N.Y. July 20, 2017) ("[A] racial imbalance in the makeup of a workplace is insufficient, by itself, to demonstrate discrimination." (quoting *Branch v. Sony Music Entm't Inc.*, No. 97-CV-9238, 2001 WL 228108, at *6 (S.D.N.Y. Mar. 8, 2001))).

Simply put, even assuming that Plaintiff had demonstrated that the alleged failure to assign her a partner, the alleged disproportionate workload, or the alleged deviation from policy was objectively and subjectively hostile, she has failed to carry her burden in showing that any instance of hostility was related to Plaintiff's being Caucasian.  Accordingly, Defendants are

entitled to summary judgment on this claim.  *See Alvarado*, 631 F. Supp. 3d at 121 (granting

summary judgment on hostile work environment claims where plaintiff pointed only to facially

neutral incidents and failed to present any evidentiary basis to infer that the incidents were

because of plaintiff's protected categories); *Stern v. McDonough*, No. 18-CV-71, 2022 WL

4236298, at *7–8 (N.D.N.Y. Sept. 14, 2022) (granting summary judgment where the record

lacked any evidence that the alleged conduct occurred because of Plaintiff's protected category);

*Lopez v. White Plains Hosp.*, No. 19-CV-6263, 2022 WL 1004188, at *10 (S.D.N.Y. Mar. 30,

2022) (granting summary judgment because plaintiff's subjective belief that facially neutral

conduct reflected discriminatory intent was insufficient to carry her burden).

    2.  Equal Protection & Constructive Discharge

Plaintiff also argues that she was constructively discharged on account of her race in

violation of the Equal Protection Clause.  (Compl. ¶ 75.)  A constructive discharge claim is

"difficult to establish and [is] routinely rejected by the courts."  *Tassy*, 2023 WL 144112, at *6

(quotation marks omitted) (quoting *Wright v. Goldman, Sachs & Co.*, 387 F. Supp. 2d 314, 325

(S.D.N.Y. 2005)).

> An employee is constructively discharged when his employer, rather than
> discharging him directly, intentionally creates a work atmosphere so intolerable
> that he is forced to quit involuntarily . . . .  [W]orking conditions are intolerable
> when, viewed as a whole, they are so difficult or unpleasant that a reasonable person
> in the employee's shoes would have felt compelled to resign.

*Cole-Hatchard v. Hoehmann*, No. 16-CV-5900, 2020 WL 5645815, at *12 (S.D.N.Y. Sept. 21,

2020) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 151–52 (2d Cir. 2003)).

This standard is "higher than the standard for establishing a hostile work environment."

*Dixon v. City of New York*, No. 23-CV-8941, 2025 WL 50140, at *10 (S.D.N.Y. Jan. 7, 2025)

(citing *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010)); *see also*

*Kunik*, 842 F. App'x at 671 (same).  And so courts have found that, where a hostile work

environment claim fails, the related constructive discharge claim must also fail.  *See Chislett v. New York City Dep't of Educ.*, 723 F. Supp. 3d 285, 300–01 (S.D.N.Y. 2024) (granting summary judgment on a constructive discharge claim because the court had also granted summary judgment on the underlying hostile work environment claim), *appeal pending*, No. 24-CV-972 (2d Cir. Apr. 15, 2024); *Buczakowski v. Crouse Health Hosp., Inc.*, No. 18-CV-330, 2022 WL 356698, at *12 (N.D.N.Y. Feb. 7, 2022) (granting summary judgment and dismissing a constructive discharge claim "because it relies on the failed hostile work environment claim" and collecting cases); *Harewood v. New York Dep't of Educ.*, No. 18-CV-5487, 2019 WL 3042486, at *7 (S.D.N.Y. May 8, 2019) (holding that, because plaintiff "failed to allege facts sufficient to state a plausible claim of hostile work environment, she likewise . . . failed to state a claim of constructive discharge" (citing *Chenette v. Kenneth Cole Productions*, 345 F. App'x 615, 620 (2d Cir. 2009) (summary order), and *Divers v. Metropolitan Jewish Health Sys.*, No. 06-CV-6704, 2009 WL 103703, at *19 (E.D.N.Y. Jan. 14, 2009))), *report and recommendation adopted*, 2019 WL 2281277 (S.D.N.Y. May 29, 2019).  Accordingly, because Plaintiff fails to carry her burden on her hostile work environment claim, the Court finds that Defendants are entitled to summary judgment on the constructive discharge claim.

### III.  Conclusion

For the reasons set forth above, Defendants' Motion is granted in its entirety.  The Clerk of the Court is respectfully directed to enter judgment accordingly, terminate the pending Motion at Dkt. No. 35, and close this case.

SO ORDERED.

Dated:    March 24, 2025
          White Plains, New York

_____

KENNETH M. KARAS
United States District Judge

27

**SA-27**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

SAMANTHA RYS,

               Plaintiff,                    22 **CIVIL** 10758 (KMK)

     -against-                         **<u>JUDGMENT</u>**

  SABRINA DAVIS and TANYA JOHNSON.

               Defendants.

-----------------------------------------------------------------------X

It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Opinion and Order dated March 24, 2025, Defendants' motion for summary judgment is GRANTED; accordingly, the case is closed.

**Dated:** New York, New York

     March 24, 2025

                                   **TAMMI M. HELLWIG**

                                _____

                                     **Clerk of Court**

**BY:**     _____

                                     **Deputy Clerk**

**SA-28**