# 25-857

# United States Court of Appeals
## for the Second Circuit

SAMANTHA RYS,

*Plaintiff-Appellant,*

v.

SABRINA DAVIS, TANYA JOHNSON,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR APPELLEES

BARBARA D. UNDERWOOD
 *Solicitor General*
JUDITH N. VALE
 *Deputy Solicitor General*
GILLIAN BARNA
 *Assistant Solicitor General*
  *of Counsel*

LETITIA JAMES
 *Attorney General*
 *State of New York*
Attorney for Appellees
28 Liberty Street
New York, New York 10005
(212) 416-8921

Dated: October 10, 2025

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................iii

PRELIMINARY STATEMENT ............................................................ 1

ISSUE PRESENTED ........................................................................ 2

STATEMENT OF THE CASE ............................................................. 2

    A.   The Parties .......................................................................... 2

    B.   Rys's Transfer Request ....................................................... 3

    C.   Partners .............................................................................. 5

    D.   Caseload ............................................................................ 7

    E.   Parolee A.R. ....................................................................... 8

    F.   Investigation into A.R.'s Threatening Conduct ..................... 10

    G.   This Litigation ................................................................... 14

STANDARD OF REVIEW AND SUMMARY OF ARGUMENT ............ 17

ARGUMENT .................................................................................. 20

POINT I

THE DISTRICT COURT PROPERLY REJECTED RYS'S DECLARATION
UNDER THE "SHAM ISSUE OF FACT" DOCTRINE ................................... 20

POINT II

THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT
TO DEFENDANTS ON RYS'S HOSTILE WORK ENVIRONMENT CLAIM ........ 23

    A.   Assignment of Partners ....................................................... 26

i

**Page**

B.   Assignment of Cases ..................................................... 28

C.   Rys's Issue with A.R. ................................................... 30

D.   Rys's Other Allegations ............................................... 37

POINT III

THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT
TO DEFENDANTS ON RYS'S CONSTRUCTIVE DISCHARGE CLAIM ............. 38

CONCLUSION .................................................................. 39

# TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ................................................................ 18

*BellSouth Telecomms., Inc. v. W.R. Grace & Co.– Conn.,*
77 F.3d 603 (2d Cir. 1996) .................................................... 32

*Brown v. Reinauer Transp. Cos., L.P.,*
788 F. App'x 47 (2d Cir. 2019) ............................................ 20

*Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,*
769 F.2d 919 (2d Cir. 1985) .................................................. 29

*Chenette v. Kenneth Cole Prods., Inc.,*
345 F. App'x 615 (2d Cir. 2009) .......................................... 38

*Chislett v. New York City Dep't of Educ.,*
No. 24-972-cv, 2025 WL 2725669 (2d Cir. Sept. 25, 2025) ............... 38

*Delaney v. Bank of Am. Corp.*
766 F.3d 163 (2d Cir. 2014) .................................................. 29

*Fincher v. Depository Tr. & Clearing Corp.,*
604 F.3d 712 (2d Cir. 2010) .................................................. 38

*Giannullo v. City of New York,*
322 F.3d 139 (2d Cir. 2003) .................................................. 23

*Goenaga v. March of Dimes Birth Defects Found.,*
51 F.3d 14 (2d Cir. 1995) ...................................................... 18

*Grullon v. City of New Haven,*
720 F.3d 133 (2d Cir. 2013) .................................................. 24

*In re Fosamax Prods. Liab. Litig.,*
707 F.3d 189 (2d Cir. 2013) .............................................. 20, 23

**Cases**                                                              **Page(s)**

*Jeffreys v. City of New York,*
  426 F.3d 549 (2d Cir. 2005) ...................................................... 18, 35

*Kaytor v. Electric Boat Corp.,*
  609 F.3d 537 (2d Cir. 2010) ........................................................... 33

*Littlejohn v. City of New York,*
  795 F.3d 297 (2d Cir. 2015) ......................................................23-24

*Natofsky v. City of New York,*
  921 F.3d 337 (2d Cir. 2019) ........................................................... 17

*Naumovski v. Norris,*
  934 F.3d 200 (2d Cir. 2019) ........................................................... 25

*Pucino v. Verizon Commc'ns, Inc.,*
  618 F.3d 112 (2d Cir. 2010) ........................................................... 26

*RainMakers Partners LLC v. NewSpring Cap., LLC,*
  No. 23-899, 2024 WL 1846321 (2d Cir. Apr. 29, 2024) ....................... 23

*Raspardo v. Carlone,*
  770 F.3d 97 (2d Cir. 2014) ............................................................. 24

*Stern v. Trustees of Columbia University in the City of
  New York,*
  131 F.3d 305 (2d Cir. 1997) ........................................................... 34

*Tassy v. Buttigieg,*
  51 F.4th 521 (2d Cir. 2022) ............................................................ 33

*United States v. Yonkers Bd. of Educ.,*
  837 F.2d 1181 (2d Cir. 1987) .......................................................... 34

*Vega v. Hempstead Union Free Sch. Dist.,*
  801 F.3d 72 (2d Cir. 2015) ............................................................. 38

| Cases | Page(s) |
|---|---|

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252 (1977) .......................................................................... 34

*Weinstock v. Columbia Univ.*,
224 F.3d 33 (2d Cir. 2000) .............................................................. 18

**Rule**

S.D.N.Y. Local Civ. R. 56.1 ................................................................ 23

**Miscellaneous Authority**

Evan Hill et al., *How George Floyd Was Killed in Policy Custody*,
N.Y. Times (May 31, 2020)
https://www.nytimes.com/2020/05/31/us/george-floyd-investigation.html ...................................................................... 6

## PRELIMINARY STATEMENT

In August 2021, plaintiff-appellant Samantha Rys resigned from her position as a parole officer in New York's Department of Corrections and Community Supervision (DOCCS). Rys then sued Sabrina Davis and Tanya Johnson, who were Rys's superiors while she was employed at DOCCS. Rys brought a claim under 42 U.S.C. § 1983, alleging that she was subjected to a hostile work environment and was constructively discharged based on her race (Caucasian) in violation of the Equal Protection Clause of the Fourteenth Amendment. The U.S. District Court for the Southern District of New York (Karas, J.) granted defendants' summary judgment motion.

This Court should affirm. Contrary to Rys's arguments, the district court correctly concluded that the summary judgment record does not contain evidence from which a reasonable jury could conclude that any of defendants' alleged conduct was based on Rys's race. Rys's conclusory assertions that Davis and Johnson treated her differently from non-Caucasian parole officers lack evidentiary support. And Rys's remaining arguments do not come close to establishing that Davis and Johnson created an abusive working environment or that they did so because of Rys's race.

## ISSUE PRESENTED

Whether the district court correctly granted summary judgment to defendants where no reasonable jury could conclude that defendants subjected Rys to a hostile work environment.

## STATEMENT OF THE CASE

### A. The Parties

Plaintiff-appellant Samantha Rys was employed by DOCCS as a parole officer. Parole officers are responsible for monitoring parolees, handling parole violations, and providing resources to parolees. (Joint Appendix (J.A.) 117-120.) From March to May 2021, Rys underwent training in Albany, New York to become a parole officer. (Joint Appendix (J.A.) 44, 114, 133, 510.) After Rys completed training, she was assigned to work in the Brooklyn Parole Office. (J.A. 45, 140.) Rys began at the Brooklyn office on May 24, 2021, and remained at that location until her resignation took effect on August 20, 2021. (J.A. 46, 48, 232, 563.)

Defendant Sabrina Davis was the bureau chief of the Brooklyn office from 2020 until July 14, 2021, when she transferred to another parole office within DOCCS. (J.A. 52, 279-281, 283, 538.) Defendant Tanya Johnson was a senior parole officer in the Brooklyn office during the

2

entirety of Rys's employment in Brooklyn. (J.A. 163-164, 278-279, 403.) During Rys's employment, Rys reported to Johnson, who in turn reported to Davis. (J.A. 163-165, 291, 405.)

**B.    Rys's Transfer Request**

Prior to her training, Rys had requested to work in Albany, Manhattan, or Poughkeepsie. (J.A. 109-111.) According to Rys, she was offered a position as a parole officer in Manhattan, which she accepted. (J.A. 108, 113.) During her training, Rys was informed that she had been assigned to the Brooklyn office. (J.A. 128.)

Rys took issue with her placement in the Brooklyn office. Rys had purportedly accepted placement at the Manhattan office because her daughter was enrolled in a graduate program in Manhattan. (*See* J.A. 131.) Rys was also concerned about the length of her commute to the Brooklyn office, which she testified could take two-and-a-half to four hours one way. (J.A. 45-46, 150.) Additionally, during training, one parole officer told Rys that the Brooklyn office would "be an adjustment" for her and another parole officer told Rys that Rys would "stick out" at the Brooklyn office. (J.A. 10, 24, 137.)

3

Shortly after starting in the Brooklyn office, Rys submitted a transfer request to human resources, explaining that she believed she should have been placed in the Manhattan office and requesting a transfer to that office. (J.A. 45-46, 154-155, 157.) Rys also asked to be transferred to Albany, New Rochelle, Peekskill, Poughkeepsie, or Schenectady. (J.A. 511.) Because Rys submitted the transfer request form after the March 31 deadline (*see* J.A. 509), she was placed on a transfer waiting list.[1] (J.A. 46; *see* J.A. 316-17, 514.)

In June 2021, Rys complained to Johnson about the length of her commute and asked for Johnson's assistance in obtaining a transfer. Johnson forwarded Rys's complaint to Davis, who advised Rys to submit a transfer request to human resources. (J.A. 47, 316, 410, 429, 535.) Because a parole officer's assignment is a determination made by human resources, Johnson and Davis did not have the ability to transfer Rys to another office. (J.A. 47, 355, 357.) Rys testified that she did not understand how transfers

---

[1] A transfer request form may not be submitted before training is completed and Rys completed training after the deadline had already passed. (*See* J.A. 46, 154.)

worked or who was responsible for approving transfer requests. (J.A. 156, 227.)

## C.    Partners

At the Brooklyn office, there are three types of partners: office partners, field training partners, and field partners. (*See* J.A. 324-325, 462.) Every parole officer is assigned an office partner. The purpose of an office partner is to provide coverage when their assigned partner is out of the office. For example, if an issue arose regarding a parole officer's case but the parole officer was out of the office, their office partner would handle the issue instead. (J.A. 462.)

When a parole officer begins at the Brooklyn office, they are trained for approximately two to four weeks. (J.A. 406; *see* J.A. 144.) As part of their training, all new parole officers are assigned field training partners, who take them into the field. (J.A. 49, 143, 321-322, 324-326, 406.) Among other things, new parole officers are trained to perform home visits and searches, to complete office reports, and to engage in the processes required when a parolee violates their conditions of parole. (J.A. 49, 140-143, 321-322.) Rys was assigned a field training partner, but testified that she could not remember her partner's name. (J.A. 143; *see* J.A. 49, 321, 408.) Rys

5

trained with her assigned partner for approximately two weeks, though Rys was out sick for a portion of that time. (J.A. 144-145.)

After a new parole officer completes the training, they have the choice to ask other parole officers to accompany them in the field. Johnson would encourage parole officers to go into the field with partners for assistance and safety, but doing so was not required. (J.A. 462; *see* J.A. 50, 328-329, 464.) As Davis testified, it is "up to the parole officer" whether to go into the field with a partner or not.[2] (J.A. 328-329.)

At some point, Rys asked Johnson for a field partner to travel to a location that Rys felt unsafe visiting.[3] Johnson advised Rys to ask other parole officers to accompany her. (J.A. 50, 219.) Rys then asked two parole officers to accompany her that day and these officers agreed to do so. According to Rys, these officers appeared annoyed and declined Rys's request for them to drive. For that reason, Rys drove. (J.A. 50, 219.) Rys

---

[2] Davis testified that at a "specific time close to" George Floyd's murder, there was a "mandate[]" that parole officers go into the field with a partner. (J.A. 329.) However, that period was approximately one year before Rys started at the Brooklyn office. *See* Evan Hill et al., *How George Floyd Was Killed in Policy Custody*, N.Y. Times (May 31, 2020) https://www.nytimes.com/2020/05/31/us/george-floyd-investigation.html.

[3] Rys never discussed her lack of a partner with Davis. (J.A. 231.)

complained about this to Johnson, who suggested that Rys ask a different parole officer to accompany her in the future. (J.A. 50, 222.) Rys then asked another parole officer to be her partner, but that parole officer allegedly told Rys that she would not travel with Rys to a certain area unless Rys got a spray tan and a hat because "there's no reason a white person goes down there unless they're arresting you or they're taking your kids." (J.A. 220-221.) Rys did not report this comment to Davis or Johnson. (J.A. 51, 222.)

## D.   Caseload

Davis bore primary responsibility for assigning caseloads to the parole officers in the Brooklyn office. (J.A. 51, 331, 416.) A parole officer may be assigned between twenty-five and seventy cases. (J.A. 51, 336.) Each parole officer is assigned to specific geographic areas, defined by police precinct, based on need. (J.A. 51, 148, 332-334.) For example, if many parolees lived within the boundaries of one precinct, it would be assigned more parole officers than a precinct with fewer parolees. (J.A. 332-333.)

After her training was complete, Rys was assigned a caseload, which included parolees who had been convicted of a variety of crimes. (J.A. 49, 146.) Rys testified that she was assigned two precincts, though she could

not remember which precincts. (J.A. 147.) Rys testified that she could not remember how many cases she was assigned. (J.A. 150.) Rys further testified that she believed that she had a comparatively undesirable caseload based on "remarks" and a comment written by another parole officer in Rys's farewell card which said the parole officer had "nightmares" about Rys's caseload. (J.A. 228-29.) Rys testified that she did not know what the caseloads of other parole officers looked like. (J.A. 229.)

## E.    Parolee A.R.

In early June, Rys was assigned to supervise parolee A.R. (J.A. 53, 168-169.) Initially, Rys and A.R. had a good rapport. (J.A. 53, 169, 172.) Shortly thereafter, A.R. was arrested regarding an incident in which A.R. kicked a bed at a shelter and injured someone in doing so (J.A. 171.) As A.R.'s parole officer, Rys was responsible for writing A.R. up for a violation of his parole.[4] (J.A. 53-54, 173.) Rys asked A.R. to report to the Brooklyn

---

[4] Rys testified that when a parolee violates the conditions of their parole, the parole officer discusses the violation with their supervisor and determines whether the parolee should be enrolled in treatment or programming, or whether the parolee should be charged with a violation of parole. (J.A. 119-121.) If the parolee is charged with a violation, the parole officer writes a "Violation of Parole," which the supervisor reviews and signs. (J.A. 122.) If a parolee violates the conditions of their parole

*(continued on the next page)*

8

office on June 23. On that date, A.R. arrived at the Brooklyn office after Rys had left for the day. (J.A. 170.) There, A.R. threatened other parole officers whom he believed to be Rys. (J.A. 54, 177.) As a result, A.R. was arrested and transported to a detention center. (J.A. 54, 178.) At the detention center, A.R. threatened to harm himself and was then transferred to a hospital for a mental health evaluation. (J.A. 54, 178-179.)

The following day, Johnson directed Rys—as A.R.'s parole officer—and another parole officer to "perform hospital duty." (J.A. 54; *see* J.A. 179-180, 420.) At the hospital, Rys introduced herself to A.R. and A.R. proceeded to threaten Rys (J.A. 55, 180-181) and spit on the other parole officer present (J.A. 421, 439). Rys called Johnson, informed her of the situation, and asked to be removed from hospital duty. (J.A. 55, 181.) Johnson agreed and sent two parole officers to the hospital to replace Rys. (J.A. 55, 181.) The two replacement parole officers arrived at the hospital quickly after Rys's

---

while the earlier violation charge is pending, the parole officer may charge the parolee with a supplemental violation of parole. (J.A. 126-27.)

The court then schedules a hearing date. (J.A. 123.) At the hearing, the parolee is represented by counsel, and the parole officer testifies as to what occurred. (J.A. 124-125.) If the court determines that a violation occurred, the parolee may be incarcerated. (J.A. 126.) If the court determines that a violation did not occur, an incarcerated parolee is released. (J.A. 125-126.)

call to Johnson and relieved Rys from hospital duty. (J.A. 55, 185-186.) Rys returned to the office and spoke with Johnson further about the incident. (J.A. 55, 186-187.)

## F.     Investigation into A.R.'s Threatening Conduct

DOCCS has a written protocol in place "to establish a systematic procedure for gathering and reporting information of a threatening nature." (J.A. 565-67.) In the event that a DOCCS employee reports that they have received threatening information, the protocol requires the bureau chief to review the relevant information and assess the validity, seriousness, urgency, and reliability of the threat. (J.A. 565-566.) If the bureau chief concludes that a "Threat Documentation Report" or an "Unusual Incident Report" is warranted, they must ensure that such a report is completed and sent to the Office of Special Investigations (OSI). (J.A. 566.) The OSI Investigator, the bureau chief, and the employee who received the threat must establish a plan of action. (J.A. 566.) OSI staff are responsible for investigating the threat and reporting their findings. (J.A. 567.) The bureau chief must review the findings of OSI's investigation with the subject of the threat. (J.A. 567.) The bureau chief ultimately decides whether to adopt OSI's recommendation. (J.A. 346.)

10

After Rys spoke with Johnson about the situation with A.R., Rys completed and submitted an Unusual Incident Report, which Johnson then sent to Davis. (J.A. 187-188, 431-432.) The following day, Johnson directed all parole officers who had had any interaction with A.R. to immediately update the parolee database with that information. Specifically, those employees completed their own Unusual Incident Reports, which Johnson sent to Davis. (J.A. 56, 432, 476-477, 564.)

Davis wrote a Threat Documentation Report describing the threats that A.R. levied against Rys, and sent the report to OSI. (J.A. 351; *see* J.A. 56, 300, 523-525.) The report stated that the threats from A.R. "should not be dismissed as mere venting" and should be investigated. (J.A. 56, 524.) Davis also told Rys to file a police report regarding the incident. (J.A. 56; 537.)

OSI Investigator Douglas Holland began investigating the incident.[5] (J.A. 56, 533.) Holland recommended to Davis that A.R. be removed from Rys's caseload. (J.A. 533.) Davis testified that because A.R. had been

---

[5] Johnson never had any contact with Holland. (J.A. 432.)

11

charged with a violation of parole and was in custody, the case could not be reassigned at that time. (J.A. 305, 345.)

Three days later, Davis sent Holland a revised Threat Documentation Report, which also reflected that the threats were serious and should be investigated. (J.A. 525-527.) The following day, Davis asked Rys to send a copy of the police report to Holland. (J.A. 56, 532.)

The preliminary hearing for A.R.'s violation of parole, stemming from the incident at the shelter, was scheduled for July 19, 2021, and the final hearing was scheduled for August 9, 2021. (J.A. 56, 198, 550-51, 592.) A parole officer must appear for the parolee's violation of parole hearing regardless of whether the parolee has threatened the parole officer. (J.A. 367; *see* J.A. 124-125.) Further, when charged with a violation of parole, a parolee must be served relevant papers informing them of the charge and hearing date. (*See* J.A. 122-123.)

On July 9, Johnson advised Rys not to serve A.R. with the hearing papers in person, in light of the threats, and instead to mail A.R. the relevant documents. (J.A. 57, 551.) On July 19, Rys appeared for A.R.'s hearing via a video call. (J.A. 57, 199.) The hearing was conducted and A.R.'s case was dismissed because of a delay in conducting the hearing. (J.A. 57,

199, 202-203.) As a result, A.R. was released from custody. (*See* J.A. 529, 548-549.) Following his release, A.R. was ordered to report to the Brooklyn office but he failed to appear. (J.A. 57, 203-204.)

On July 23, A.R. was removed from Rys's caseload and assigned to a different parole officer. (J.A. 57, 197, 547; *see* J.A. 206.) Four days later, an absconder warrant was issued for A.R.'s arrest. (J.A. 531, 547.) On August 3, A.R. was arrested in the Bronx. Five days later, A.R. experienced several seizures and, as a result, was transported to a hospital and placed in a medically induced coma. (J.A. 58, 529-530.)

On August 12, Holland submitted a final investigative report recommending that A.R. remain off of Rys's caseload and that Rys work in a different borough. (J.A. 58, 528-30.) That same day, A.R. awoke from his coma, but he remained in custody at the hospital. (J.A. 59, 534.) On August 16, A.R. had a hearing at which Rys purportedly testified. (J.A. 205, 209; *see* J.A. 534.) On August 18, Rys submitted her resignation, effective August 20. (J.A. 232, 563.)

### G. This Litigation

In December 2022, Rys filed this lawsuit in the U.S. District Court for the Southern District of New York against Davis and Johnson pursuant to 42 U.S.C. § 1983, asserting that Davis and Johnson created a hostile work environment and constructively discharged Rys on the basis of her race, in violation of the Fourteenth Amendment's Equal Protection Clause. (J.A. 23-31.)

Davis and Johnson answered the complaint (J.A. 32-42), and the parties began discovery, taking depositions from Rys (J.A. 64-235), Davis (J.A. 271-368), and Johnson (J.A. 392-481). Davis and Johnson then moved for summary judgment. (Mem. in Supp. Of Defs.' Mot. for Summ. J. (Mem.) (May 20, 2024), ECF No. 28; *see* J.A. 43.)

After Rys's deposition and after defendants had already moved for summary judgment, Rys submitted a sworn declaration contradicting her deposition testimony and asserting new facts about which she had not previously testified. (J.A. 603-608; *compare* J.A. 608 (Rys's declaration dated June 20, 2024), *with* J.A. 64 (Rys's deposition dated February 21, 2024), *and* Mem. at 24 (summary judgment motion dated May 20, 2024).) As relevant here, Rys asserted in her declaration that she was assigned

14

three police precincts and that she had knowledge, based on discussions with other parole officers, that "African American parole officers were assigned one or two" precincts. (J.A. 604.) Further, Rys stated that two parole officers who declined to partner with her offered "race-based reasons" for doing so, including that Rys was a "snow cone." (J.A. 604 (quotation marks omitted).) Rys also asserted in her declaration that she had complained to Johnson that all other parole officers were "given partners" but her. (J.A. 604.) And Rys claimed that she had "repeatedly" raised an issue with Johnson about going into the field without a partner and asked for Johnson's assistance. (J.A. 605.)

In March 2025, the district court granted defendants' motion for summary judgment because Rys had failed to meet her burden on her hostile work environment and constructive discharge claims. (*See* Special App. (S.A.) 1-27.) First, the district court deemed admitted proposed facts in defendants' Rule 56.1 statement that plaintiff had failed to specifically controvert, and disregarded proposed facts in Rys's Rule 56.1 statement for which she did not include a citation to the record. (S.A. 2 n.1.) Next, the court concluded that Rys's declaration constituted a "sham affidavit" because Rys attempted to create factual disputes in the declaration which

15

contradicted her previous deposition testimony "in an attempt to bolster her claims of disparate treatment." (S.A. 15.) The court provided examples, including that Rys had initially testified that she was assigned to cover two precincts, but then, in her declaration, Rys asserted that she was assigned to cover three precincts. (S.A. 13-14.) Accordingly, the court did not credit the new assertions that Rys made in her declaration that contradicted her deposition testimony. (S.A. 15.)

Next, the court concluded that Rys failed to meet her burden on the hostile work environment claim because, even assuming that defendants' alleged conduct created an objectively and subjectively hostile work environment, Rys failed to show that any of the alleged conduct was related to Rys's race. (S.A. 19-25.)

Taking Rys's arguments in turn, the court first rejected Rys's argument that Johnson treated Rys differently from other parole officers. The court stated that the undisputed evidence established that defendants assigned field training partners and office partners, but not field partners. (S.A. 20.) Further, the court observed that Rys failed to cite any evidence that Rys was assigned more cases than Black parole officers or that her caseload was more onerous. (S.A. 21-22.)

16

The court also rejected Rys's claim that defendants' handling of Rys's issue with A.R. was affected by Rys's race, concluding that Rys failed to provide any circumstantial evidence of race-based discrimination. (S.A. 23.) The court observed that Rys could point only to one instance in which her race was referenced in the Brooklyn office (the "spray tan" comment) and explained that this incident did not involve Davis or Johnson, nor did Rys report the incident to Davis or Johnson. (S.A. 23.) And Rys failed to make any other allegations regarding defendants' handling of the A.R. situation that even touched on race. (S.A. 23-24.)

Lastly, the court held that because Rys failed to meet her burden on her hostile work environment claim, her related constructive discharge claim also failed. (S.A. 25-26.)

**STANDARD OF REVIEW AND SUMMARY OF ARGUMENT**

This Court reviews the district court's grant of summary judgment de novo. *Natofsky v. City of New York*, 921 F.3d 337, 344 (2d Cir. 2019). "[C]onstruing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in [the nonmoving party's] favor," this Court must determine whether the record reveals "no genuine dispute as to any material fact." *Id.* (quotation marks omitted). A fact is

17

material if it "might affect the outcome of the suit under the governing law" and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"To defeat summary judgment," the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts" and "may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quotation marks omitted). Indeed, "unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). The party moving for summary judgment has met its burden if it "can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).

Applying these standards here, the district court properly granted summary judgment to defendants because no reasonable jury could conclude that defendants created a hostile work environment or that they did so because of Rys's race. As a preliminary matter, Rys is unable to rely on her declaration to create a genuine dispute as to material facts, because

18

it repeatedly contradicted her deposition testimony, and was submitted only after defendants had submitted their motion for summary judgment. Moreover, Rys is unable to demonstrate that she was treated differently from non-Caucasian parole officers in any respect or that defendants mishandled the issue that Rys had with A.R. Rys further failed to provide any evidence from which a reasonable jury could infer that racial discrimination was the but-for cause of defendants' alleged conduct. Lastly, because Rys cannot establish that defendants subjected her to a hostile work environment based on her race, Rys's constructive discharge claim also fails.

19

## ARGUMENT

## POINT I

### THE DISTRICT COURT PROPERLY REJECTED RYS'S DECLARATION UNDER THE "SHAM ISSUE OF FACT" DOCTRINE

As an initial matter, the district court correctly determined that Rys's declaration could not create genuine issues of material fact and declined to credit allegations that Rys raised for the first time in her declaration which contradicted her deposition testimony. (*See* S.A. 13-15.) Under the "sham issue of fact" doctrine, a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that contradicts the affiant's previous sworn testimony. *In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 193-94 (2d Cir. 2013). This doctrine does not apply where the affidavit addresses an issue that was not fully explored in the deposition or where the relevant deposition responses were ambiguous. *Brown v. Reinauer Transp. Cos., L.P.*, 788 F. App'x 47, 49 (2d Cir. 2019).

Here, Rys's declaration, submitted after her deposition and defendants' summary judgment motion, contradicts her deposition testimony in numerous respects. First, when asked whether she knew what her

20

coworkers' caseloads looked like, Rys testified that she did not because she "kept things in [her] lane." (J.A. 229.) But in her declaration, Rys asserted that she actually had conversations with her coworkers about their caseloads and knew from those conversations that "African American parole officers were assigned one or two, most usually two" precincts. (J.A. 604.) Rys also testified during her deposition that she was assigned two precincts (J.A. 147), but asserted in her declaration that she was assigned three police precincts (J.A. 604).

Further, Rys testified during her deposition that she asked Johnson for assistance in finding a partner only once, and that she reported only one incident of parole officers treating her poorly to Johnson. (*See* J.A. 222-223.) When asked whether she reported anything else regarding the treatment she received from the other parole officers, Rys testified that she did not. (J.A. 223.) But in her declaration, Rys asserted that she "viewed not having a partner as being all about [her] race," that other parole officers "expressed concern for [Rys's] safety because of [her] race," and that she "repeatedly raised [the] issue with Johnson about how to go out alone, without a partner, and asked for her assistance in that regard." (*See* J.A. 605.)

21

Rys also stated in her declaration that a parole officer declined to partner with her because she was a "snow cone." (J.A. 604.) But in testifying about the conversations she had with other parole officers regarding partnering, Rys did not testify about this "snow cone" comment. (*See, e.g.,* J.A. 219-21.) Though Rys asserted in her complaint that a coworker called her a "snow cone," she did not assert that such comment arose in the context of her seeking a partner. (J.A. 25.)

Lastly, Rys testified that A.R. was arrested for the incident at the shelter after she had been assigned as his parole officer and had a phone conversation with him. (J.A. 170-171.) But in her declaration, Rys stated that the parole revocation hearing on July 19 "concerned a matter which preceded [her] time as his parole officer and could have been handled by anyone." (J.A. 607.) Since the July 19 hearing concerned the shelter incident (J.A. 592), Rys's declaration patently contradicts her testimony.

These new, contradictory allegations plainly seek to bolster Rys's claims of disparate treatment and hostile work environment, as the district court correctly concluded (S.A. 13-15). That Rys submitted this contradictory declaration after defendants had already filed their motion for summary judgment further confirms that the declaration was created solely

to defeat the motion. *See In re Fosamax Prods. Liab. Litig.*, 707 F.3d at 194-95. For that reason, this Court, like the district court, should disregard Rys's declaration under the "sham issue of fact" doctrine.[6]

## POINT II

### THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO DEFENDANTS ON RYS'S HOSTILE WORK ENVIRONMENT CLAIM

A plaintiff asserting a hostile work environment claim under § 1983 must establish that her "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Littlejohn v. City of New York*, 795 F.3d 297, 320-21 (2d Cir. 2015) (quotation marks omitted). This showing has an objective and a subjective component. The alleged conduct must be objectively "severe or pervasive

---

[6] The district court correctly deemed admitted the facts within defendants' Rule 56.1 statement that Rys failed to specifically controvert, which Rys does not dispute. (See S.A. 2 n.1.) *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003); S.D.N.Y. Local Civ. R. 56.1(c). The court also properly disregarded the portions of Rys's response to defendants' Rule 56.1 statement which have no accompanying citation to the record. *See RainMakers Partners LLC v. NewSpring Cap., LLC*, No. 23-899, 2024 WL 1846321, *2 (2d Cir. Apr. 29, 2024) (summary order).

23

enough that a reasonable person would find it hostile or abusive" and the plaintiff must subjectively perceive the conduct to be abusive. *Id.* at 321 (quotation marks omitted). In evaluating whether a plaintiff suffered a hostile work environment, a court must consider the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, or "a mere offensive utterance," and whether such conduct unreasonably interfered with the plaintiff's work performance. *Id.* (quotation marks omitted).

A supervisory defendant may be held liable under § 1983 for a constitutional deprivation only if that defendant was personally involved in such deprivation. *Grullon v. City of New Haven*, 720 F.3d 133, 137-38 (2d Cir. 2013); *see Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014). This standard is satisfied where the supervisory defendant participated directly in the alleged violation, was informed of the alleged violation and failed to remedy it, created or allowed a policy under which the alleged violation occurred, was grossly negligent in supervising subordinates who committed the alleged violation, or demonstrated deliberate indifference in failing to act on information that violations were occurring. *Id.* Addition-

24

ally, the plaintiff must establish that the supervisory defendant acted with discriminatory intent and that such intent was a "but-for" cause of the hostile work environment. *Naumovski v. Norris*, 934 F.3d 200, 214 (2d Cir. 2019) (quotation marks omitted).[7]

Rys argues that the district court erred in granting defendants summary judgment because a reasonable jury could conclude that (1) Johnson treated Rys differently with respect to the assignment of field partners (*see* Br. for Appellant at 34-35); (2) Davis treated Rys differently with respect to the assignment of cases (Br. at 35-36); and (3) Davis and Johnson acted with "callous disregard" for Rys's safety and deviated from DOCCS's procedure in their response to the A.R. situation (Br. at 36-41). But Rys fails to point to any evidence from which a reasonable jury could infer that Davis and Johnson engaged in any of the alleged conduct because of Rys's race.

---

[7] Rys is incorrect in asserting that a plaintiff need show only that race was a motivating factor in a defendant's conduct. *See* Br. at 25. As this Court has stated, it is insufficient for a plaintiff pursuing a hostile work environment claim under § 1983 "to establish simply that invidious discrimination was a motivating factor of the offending conduct." *Naumovski*, 934 F.3d at 214 (quotation marks omitted).

Rys's first two arguments—regarding partner and case assignments—rest on a theory of disparate treatment. Though a supervisor's disparate treatment of employees of a particular race may allow a reasonable jury to conclude that the supervisor acted with discriminatory intent, *see Pucino v. Verizon Commc'ns, Inc.*, 618 F.3d 112, 118 (2d Cir. 2010), there is no evidence from which a reasonable jury could conclude that Davis and Johnson treated Rys differently than non-Caucasian parole officers. Rather, Rys was given the same opportunities and responsibilities as any other parole officer in the Brooklyn office.

## A.    Assignment of Partners

There is no merit to Rys's argument that Johnson created a hostile work environment by assigning every parole officer except Rys a field partner.[8] Rys's argument rests on the incorrect premise, which lacks any record support, that Johnson assigned a field partner to any parole officers. As established by the uncontroverted evidence, parole officers are assigned only office and field training partners. (*See* J.A. 143, 321, 324-326, 328-329, 406, 462.) While parole officers who have completed training are encour-

---

[8] Rys alleged in her complaint that she was "one of very few Caucasian parole officers assigned to this office." (J.A. 24.)

aged to go into the field with another parole officer, Davis and Johnson did not assign field partners or require any parole officer to have a field partner. (J.A. 328-329, 462, 464.)

Rys's assertion that "Davis testified that all [parole officers] are supposed to have partners, assigned to them by" a senior parole officer is belied by the record. Br. at 34; *see id.* at 8. Davis testified that parole officers are not assigned field partners. When asked whether it was the "general practice at that point of the Brooklyn bureau to have individual parole officers go in the field with another parole officer," Davis responded: "No. It's really up to the parole officer." (J.A. 328-329.) And Rys fails to point to any portion of Davis's testimony where Davis said otherwise. The few pages of Davis's testimony that Rys cites (Br. at 8) explain only that new parole officers are assigned a field training partner. (*See* J.A. 319-328.) Rys admits that field training partners are assigned, and that she was assigned one. Br. at 7 (citing J.A. 143).

Rys admits that she does not have personal knowledge that field partners were assigned to other parole officers. When asked whether Johnson assigned field partners or whether parole officers chose their own partners, Rys responded: "I don't know how they did it," and "I don't know

27

how it worked . . . I just know for me, I didn't have a partner. And I was the only one that did not have a partner there." (J.A. 221-222.) That other parole officers had field partners does not establish that such partners were assigned or that Davis or Johnson played any role in partnering those officers. And that other parole officers may have had more success than Rys in finding a willing partner does not establish that Davis or Johnson engaged in racially discriminatory conduct against Rys.

## B. Assignment of Cases

As the district court correctly concluded, there is no record evidence establishing that Rys had a disproportionately burdensome workload. (*See* S.A. 19-20.) Rys testified only that she was assigned cases in two precincts and that she could not remember which precincts she covered or how many cases she was assigned. (J.A. 147, 150.) While Rys testified that she believed she had an undesirable caseload because "people would make remarks," she could not provide any specific examples of those remarks. (J.A. 228-229.) A reasonable jury could not conclude, based on such scant evidence, that Rys carried a more onerous caseload than non-Caucasian parole officers. Indeed, Rys testified that she did not know what other

28

parole officers' caseloads looked like, making comparison infeasible. (J.A. 229.)

Rys primarily relies on a farewell card in which a colleague purportedly wrote, "I have nightmares about the 76, 78 and 84" precincts.[9] Br. at 13, 29, 36 (citing J.A. 605, 615.) As a preliminary matter, the farewell card may not be considered on summary judgment. A party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment absent a showing that admissible evidence will be available at trial." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) (citations omitted). The statement in the card is inadmissible hearsay, as it constitutes an out-of-court statement that Rys offers for the truth of the matter asserted. *See Delaney v. Bank of Am. Corp.* 766 F.3d 163, 169 (2d Cir. 2014). And Rys fails to provide a basis for its admission. *See* Br. at 29. In any event, the farewell card does not establish that Rys had a more burdensome caseload than non-Caucasian parole officers. Even assuming, arguendo, that the precincts Rys covered presented difficult

---

[9] The copy of the farewell card in the record is illegible. (*See* J.A. 610.) We rely on, but do not admit, Rys's characterization of its contents. *See* Br. at 13. (*See also* J.A. 582, 605.)

cases, the card's comment reveals nothing about the difficulty level of other parole officers' cases or precincts.

Rys's reliance on her own statements in her late-submitted declaration fares no better. *See* Br. at 35-36. As discussed (*supra* at 20-21), Rys's declaration statements that she was assigned three precincts and that other parole officers were assigned only one or two precincts directly contradict her deposition testimony and should not be considered. But even if the Court were to accept that Rys was assigned more precincts than other parole officers, that would not establish that Rys had more *cases* than other parole officers or that her cases were more difficult. Accordingly, there is insufficient evidence from which a reasonable jury could conclude that Rys received disparate treatment regarding case assignments.

## C.   Rys's Issue with A.R.

Rys is also incorrect in asserting that Davis and Johnson failed to follow DOCCS's protocol and acted with callous disregard for Rys's safety regarding Rys's issue with A.R. *See* Br. at 36-41. To the contrary, the uncontroverted record evidence establishes that Davis and Johnson took

immediate and continuing action to effectuate DOCCS's applicable protocol and ensure Rys's safety.

For example, when Johnson was made aware that A.R. had threatened Rys while Rys was at the hospital, she immediately sent two parole officers to the hospital to relieve Rys. (J.A. 181, 185-186.) When Rys came back to the Brooklyn office from the hospital, Johnson spoke with her about the incident and Rys submitted an Unusual Incident Report to Johnson, which Johnson sent to Davis. (J.A. 187-188, 431-432.) Johnson also directed all parole officers to provide information regarding any interaction they had had with A.R., and Johnson sent such information to Davis. Additionally, two weeks after the incident, Johnson advised Rys that given A.R.'s threats, she should mail documents regarding A.R.'s upcoming parole violation hearing to A.R. rather than serve them in person. (J.A. 57, 551.)

Davis also took A.R.'s threats against Rys seriously, as the undisputed evidence demonstrates. Davis wrote a Threat Documentation Report describing the incident, which she sent to OSI in accordance with DOCCS's procedure. (J.A. 351, 566; *see* J.A. 300, 523-525.) In that report, Davis recommended to OSI that the threats should not be dismissed and

31

should be investigated. (J.A. 524.) Davis further advised Rys to fill out a police report and send that report to OSI. (J.A. 532, 537.) Even after Davis left the Brooklyn office, Davis ensured that communications she received regarding Rys and A.R. were directed to the appropriate channels.[10] (*See, e.g.*, J.A. 531.)

The only provision of DOCCS's protocol that Rys specifically alleges was violated is the requirement to develop a "plan of action." *See, e.g.*, Br. at 17, 20, 37, 40. In support of her assertion that Davis[11] violated this provision, Rys points only to her own self-serving declaration, which states, "There certainly was no safety plan in place for me." (J.A. 607). *See* Br. at 17. But a conclusory statement in a self-serving affidavit, unsupported by any other record evidence, is insufficient to create a genuine issue of material fact. *See BellSouth Telecomms., Inc. v. W.R. Grace & Co.– Conn.*, 77 F.3d 603, 615 (2d Cir. 1996). Regardless, Davis and Johnson took

---

[10] Davis was present and working in the Brooklyn office for only a short time after the incident with Rys and A.R. Approximately twenty days after the incident, Davis transferred out of the Brooklyn office. Davis was also on vacation and out of the office for a portion of the period between the incident and her departure from the office. (*See* J.A. 538.)

[11] Johnson, as a senior parole officer, is not tasked with effectuating DOCCS's threat protocol. (*See* J.A. 565-567.)

numerous steps to ensure Rys's safety, including submitting multiple reports to OSI so that OSI could investigate (J.A. 351; *see* J.A. 56, 300, 523-525), encouraging Rys to file a police report (J.A. 56, 537), and ensuring that Rys would not have to be in the same physical space as A.R. (J.A. 57, 551).

Even assuming that Davis deviated from DOCCS's procedure, such deviation would not create a genuine question of material fact for the jury. Where a plaintiff asserting a hostile work environment claim relies on facially race-neutral incidents, they must offer "some circumstantial or other basis for inferring" that the incidents were discriminatory. *Tassy v. Buttigieg*, 51 F.4th 521, 533 (2d Cir. 2022). For instance, a plaintiff could provide evidence that the defendants engaged in multiple hostile acts, some of which were overtly motivated by race even if others were facially neutral. *See Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 547-48 (2d Cir. 2010). Rys provides no such evidence, nor any evidence from which a reasonable jury could infer that racial discrimination was the but-for cause of the alleged deviation from DOCCS's procedure. Indeed, Rys does not put forth any plausible argument that defendants' response to the A.R. situation was shaped by Rys's race.

33

Rys relies on inapposite cases in asserting that a deviation from policy demonstrates discriminatory intent here. *See* Br. at 36. In those cases, the courts considered whether the relevant policy or procedure was applied anomalously to the party claiming discrimination. For example, in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, the respondents argued that the petitioner's application of a zoning policy to respondents demonstrated discriminatory motive because such application was inconsistent with the petitioner's usual practice. 429 U.S. 252, 269 (1977). The Supreme Court disagreed, concluding that petitioner's application of the policy was too consistent to infer discriminatory intent. *Id.* at 269-70. And in *Stern v. Trustees of Columbia University in the City of New York*, this Court concluded that the defendant's "atypical," "unprecedented," and "unusual" departure from its past hiring practices, among several other indicia of discrimination, could demonstrate that the defendant declined to hire plaintiff based on his national origin. 131 F.3d 305, 312-13 (2d Cir. 1997) (quotation marks omitted); *see also United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1222 (2d Cir. 1987) (characterizing deviation as "unprecedented"). Here, Rys has not provided any evidence that DOCCS's protocol was applied differently to Rys from the way it was

applied to non-Caucasian parole officers, or indeed any evidence at all demonstrating how DOCCS's protocol has been applied to other parole officers.

Rys's other arguments regarding defendants' handling of the A.R. situation are also unavailing. First, while Rys argues that Davis and Johnson erred in failing to remove A.R. from Rys's caseload immediately after the threatening incident (Br. at 37-38, 40), Davis explained that cases cannot be reassigned while the parolee has a pending violation proceeding and is in custody. (J.A. 305, 345.) Rys's conclusory assertion that the Brooklyn office does not have such a policy is unsupported by her own record citation (*see* Br. at 14, 16, 37-38), and thus fails to create an issue of fact. *See Jeffreys*, 426 F.3d at 554. And Rys cannot point to any provision in DOCCS's threat protocol which requires immediate reassignment.

Second, although Rys also takes issue with her assignment to cover hospital duty on June 24 (Br. at 38), there is no evidence that Davis or Johnson was aware of A.R.'s conduct on June 23, when Rys was assigned to, and performed, hospital duty. Rys contends otherwise but fails to cite record evidence beyond her declaration to support her assertion. *See* Br. at 14. Regardless, as discussed above, A.R. could not be removed from Rys's

caseload at that time. (J.A. 305, 345.) And once Johnson learned of A.R.'s threatening behavior at the hospital, she sent two parole officers to relieve Rys. (J.A. 181, 185-186.)

Third, Rys's assertion that Johnson is responsible for A.R.'s release on July 19 due to Johnson's purported delay in signing off on a supplemental charge of parole violation (Br. at 41-42) is unsupported by the record. As Rys testified, A.R. was released because of a delay in conducting the hearing pertaining to the shelter incident. (*See* J.A. 199-200, 202-203.) Rys also asserts in her late-submitted declaration that she "testified at a revocation hearing related to A.R.'s conduct toward [her]" on August 16, which suggests that a supplemental charge was signed and filed with the court. (*See* J.A. 607.) In any event, Rys fails to explain why Johnson declining to approve a new parole violation charge for A.R. on Rys's preferred timeline would necessarily constitute racial discrimination against Rys.

Lastly, to the extent that Rys asserts that Davis and Johnson were required to arrange for Rys to park in the office's garage (Br. at 18, 38, 43), Rys fails to cite any relevant provision in DOCCS's policy requiring such action or to explain how parking in the garage would have improved her safety during a time when A.R. was in custody. Rys further fails to explain

36

why declining to grant Rys special parking privileges constitutes racial discrimination against Rys.

**D.    Rys's Other Allegations**

Rys's remaining allegations similarly fail to raise a genuine dispute of material fact. Rys takes issue with her assignment to the Brooklyn office and discusses at length her difficulty obtaining a transfer to another office (Br. at 3-6), but it is undisputed that Davis and Johnson had no control over the decision to place Johnson in the Brooklyn office or over a transfer to another office (J.A. 47, 355, 357; *see* J.A. 156, 227). Additionally, while Rys alleges that comments regarding Rys's race were directed at her by other parole officers, it is undisputed that Rys did not report these comments to Johnson and Davis. (J.A. 222-223, 582.)

37

## POINT III

### THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO DEFENDANTS ON RYS'S CONSTRUCTIVE DISCHARGE CLAIM

Finally, Rys's constructive discharge claim fails because it is based on her failed hostile work environment claim. Where an alleged constructive discharge stems from an alleged hostile work environment, the plaintiff must show that her working conditions were "so intolerable that a reasonable person would have felt compelled to resign." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010) (quotation marks omitted) (title VII claim).[12] "This standard is higher than the standard for establishing a hostile work environment." *Id.* As a result, a plaintiff who fails to establish a hostile work environment has necessarily failed to establish her claim of constructive discharge. *Id.*; *Chenette v. Kenneth Cole Prods., Inc.*, 345 F. App'x 615, 620 (2d Cir. 2009). Because Rys fails to establish a hostile work environment, the district court correctly concluded that defen-

---

[12] The same standard applies to constructive discharge claims whether they are brought under Title VII or under § 1983 and the Equal Protection Clause. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88 (2d Cir. 2015); *see, e.g.*, *Chislett v. New York City Dep't of Educ.*, No. 24-972-cv, 2025 WL 2725669, *14 (2d Cir. Sept. 25, 2025) (relying on Title VII cases).

38

dants are entitled to summary judgment on the constructive discharge claim. (*See* S.A. 25-26.)

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment should be affirmed.

Dated:  New York, New York
October 10, 2025

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellees

By:  /s/ *Gillian Barna*
GILLIAN BARNA
Assistant Solicitor General

BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
GILLIAN BARNA
  *Assistant Solicitor General*
    *of Counsel*

28 Liberty Street
New York, New York 10005
(212) 416-8921

39

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Mary Quinn Moss, an employee in the Office of the New York State Attorney General, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 7,696 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Mary Quinn Moss*