*To be Argued by Michael H. Sussman, Esq.*

# 25-857

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

----------------------------------------------------------

SAMANTHA RYS,

*Plaintiff-Appellant,*

v.

SABRINA DAVIS, TANYA JOHNSON,

*Defendants-Appellees.*

----------------------------------------------------------

**On Appeal from an Order and Judgment of the United States District Court
for the Southern District of New York**

---

## APPELLANT'S REPLY BRIEF

---

SUSSMAN & ASSOCIATES
*Attorneys for Plaintiff-Appellant*
1 Railroad Avenue, Suite. 3
P.O. Box 1005
Goshen, New York 10924
(845) 294-3991 [Tel]
(845) 294-1623 [Fax]
sussman1@sussman.law

# TABLE OF CONTENTS

INDEX TO CITATIONS      ii-iii

PRELIMINARY STATEMENT      1

DISPUTED FACTS PRECLUDE SUMMARY JUDGMENT      1-2

APPELLANT DID NOT SUBMIT A "SHAM AFFIDAVIT"      2-9

A REASONABLE JURY COULD CONCLUDE THAT
APPELLEES SUBJECTED RYS TO A HOSTILE WORK
ENVIRONMENT BECAUSE OF HER RACE      9-15

CONCLUSION      15

CERTIFICATION

# INDEX TO CITATIONS

**CASES**                                                   **PAGES**

*BIC Corp. v. Far E. Source Corp.*, 23 F. App'x 36 (2d Cir. 2001)    12

*Brady v. Chemical Construction Corp.*, 740 F.2d 195 (2d Cir. 1984)    12

*Dressler v. MV Sandpiper*, 331 F.2d 130 (2d Cir. 1964)    4

*Engl v. Aetna Life Insurance Co.*, 139 F.2d 469 (2d Cir. 1943)    4

*Garcia v. New Force Constr. Corp.*, No. 23-CV-2336, 2025
U.S. Dist. LEXIS 137815, at *13-14 (E.D.N.Y. July 18, 2025)    3

*Howley v. Town of Stratford*, 217 F.3d 141 (2d Cir. 2000)    12

*In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189 (2d Cir. 2013)    7-8

*Johnson v. Mich. Dep't of Corr.*, 865 F.2d 258 (6th Cir. 1988)    14

*Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238 (2d Cir. 1984)    3

*Littlejohn v. City of New York*, 795 F.3d 297 (2d Cir. 2015)    10

*Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572 (2d Cir. 1969)    3-5

*Sutera v. Schering Corp.*, 73 F.3d 13 (2d Cir. 1995)    2

*Tassy v. Buttigieg*, 51 F.4th 521(2d Cir. 2022)    14

*United States v. Urlacher*, 979 F.2d 935 (2d Cir. 1992)                     12

*Weyant v. Okst*, 101 F.3d 845 (2d Cir. 1996)                     2

**<u>Statutes and other sources</u>**

Fed. R. Evid. 701(b)                     12

F.R.Civ.P. 56(f)                     4

6 Moore, Federal Practice para. 56.22[1] at 2814 (2d ed. 1965)                     3

## PRELIMINARY STATEMENT

Appellant respectfully submits this Reply Brief in further support of her contention that the district court erred in granting her two supervisors' motion for summary judgment on her reverse race discrimination claim.

In their preliminary statement, appellees claim that Rys' disparate treatment claims "lack evidentiary support" and are "conclusory." However, the record shows the opposite: appellees have presented scant admissible evidence refuting appellant's sworn testimony that both subjected her to different treatment when they [a] failed to assign her a partner, [b] gave her more onerous and numerous assignments than minority peers and [c] exhibited deliberate indifference toward her by failing to implement agency policies intended to safeguard parole officers seriously threatened by parolees. In this light, a reasonable jury could find that her supervisors constructively discharged her.

## I.   DISPUTED FACTS PRECLUDE SUMMARY JUDGMENT

If a jury believes that appellees assigned Rys a larger caseload than other similarly-situated African American parole officers and failed to assign her a field partner because her peers would not go into the field with her on account of her race and delayed in re-assigning a threatening parolee to another worker and failed to take basic measures to ensure her safety as they maintained him on her caseload,

it could determine she was subjected to a hostile work environment and constructively discharged. Appellant submits that her supervisors should have removed the offending parolee from her caseload following his threats. The agency's own investigator, Holland, recommended this course weeks before its implementation. There is clearly a factual dispute as to why appellant remained this parolee's officer and whether appellees deviated from agency policy – which required separating a threatened subordinate from an offending parolee – and whether doing so represented an intentional disregard for the safety of the only Caucasian they then supervised.

As on this record, each of these issues is disputed, the district court erred in granting appellees' summary judgment.

## II.     APPELLANT DID NOT SUBMIT A "SHAM AFFIDAVIT"

To avoid this outcome, the district court had to discount appellant's Declaration. That is so because "[I]n determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996); *Sutera v. Schering Corp.*, 73 F.3d 13, 15-16 (2d Cir. 1995) (explaining that a court's responsibility in

2

assessing the merits of a summary judgment motion is not to try issues of fact, but merely to "determine whether there *are* issues of fact to be tried." (quoting *Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 244 (2d Cir. 1984))." *Garcia v. New Force Constr. Corp.*, No. 23-CV-2336, 2025 U.S. Dist. LEXIS 137815, at *13-14 (E.D.N.Y. July 18, 2025. As appellant did dispute facts integral to appellees' motion, accepting her version of events would have inexorably caused its denial.

Contrary to appellees' suggestion, in opposing motions for summary judgment, plaintiffs frequently submit sworn statements which refute movants' allegedly undisputed statements of material facts. And, on occasion, due to a refreshed recollection, their later statements may differ from former sworn testimony. This makes neither a sham. "The deposition of a witness will usually be more reliable than his affidavit, since the deponent was either cross-examined by opposing counsel, or at least available to opposing counsel for cross-examination. Nevertheless, if a witness has made an affidavit and his deposition has also been taken, and the two in some way conflict, the court may not exclude the affidavit from consideration in the determination of the question whether there is any genuine issue as to any material fact." 6 Moore, Federal Practice para. 56.22[1] at 2814 (2d ed. 1965), cited approvingly in *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969).

Likewise, the content of a Declaration may discuss issues about which a

3

party was not questioned at deposition. *Cf., Perma Research & Dev. Co., supra.* at 578 ("During four days of deposition-taking Perrino was repeatedly asked to specify the basis of the fraud he alleged, and we think it is significant that he made no reference to the alleged conversation with Person when Singer might have had an opportunity to cross-examine him about [**17] it. We think it is also significant that Perma's lawyers failed to question Person about the alleged conversation when they examined him on deposition. Since Perrino was admittedly a party to that conversation, this is plainly not a case where the party opposing summary judgment can complain of non-access to material facts. See Rule 56(f), Fed.R.Civ.P. Nor is this a case where the contradicting affidavit can fairly be said to contain evidence "newly discovered." If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.
*Cf. Dressler v. MV Sandpiper*, 331 F.2d 130 (2d Cir. 1964). *Compare Engl v. Aetna Life Insurance Co.*, 139 F.2d 469 (2d Cir. 1943), where Judge Clark observed that a party who resists summary judgment cannot hold back his evidence until the time of trial."). Again, providing information in a responsive Affidavit which opposing counsel never pursued at deposition is hardly indicative of a sham affidavit.

4

In this case, the district court abused its discretion in concluding that appellant's declaration was "sham" and in discounting her sworn account of relevant events in resolving the summary judgment motion.

First, appellant's complaint does include the "snow cone" comment of her co-worker. JA-25, para. 18 ["Another co-worker told plaintiff that she was the snow cone in the building and made clear that she did not fit in and could not safely do her job on account her race."]. Obviously, appellant did not invent this to buttress her response to the summary judgment motion. Nor can appellees claim any surprise that, in opposing summary judgment, appellant referenced this comment as a component of the racially hostile work environment to which she was subjected. Unlike the situation in *Perma Research & Dev. Co., supra.*, the verifiable fact is that appellees' counsel never asked a direct question about this incident at appellant's deposition, JA-64-235, and appellant cannot fairly be faulted for not volunteering this information when no question reasonably elicited testimony on the subject.

Second, appellant never asserted that she knew the exact caseload of all of her similarly situated co-workers. She did not provide inconsistent testimony on this subject. When asked at deposition, "Do you know what everybody else's caseload looked like?," she responded, "I kept things in my lane. I didn't do that." JA-229. However, when earlier asked about her claim that she had the most

5

undesirable caseload, Rys consistently explained, "It was indicated --- in conversations and going down where I handled. It was in conversations. People would just make remarks. I can't give anything specific.  But then in my card, which I believe is in discovery, it says right on it that it's – the person has nightmares about my caseload." [JA-228-29].  In this testimony, appellant referred to a note on her farewell card written by a co-worker, T. Brown, who specifically referenced the precincts to which appellant was assigned, "I have a nightmares about – 76, 78, 84." JA-611.

In her Declaration submitted in opposition to appellees' motion for summary judgment, Rys explained that while she did not know the precinct number to which her co-workers were assigned, she knew they were assigned to only one or two precincts because "we discussed the areas to which we were assigned."  JA-604, para. 7. She also recalled, based upon her review of the farewell card sent to her by a colleague, that she was assigned to three precincts. *Id.*

Information concerning how many precincts/cases each parole officer was assigned should have been in appellees' possession. They understood this was an issue in the case and their counsel certainly questioned appellant about the matter. But, in their reply papers supporting summary judgment, they provided no refutation of her testimony that she was assigned three precincts and others, one or two.

Third, while employed, appellant repeatedly raised issue with not being assigned a field partner. She did not raise this only once as appellees claim she testified to at deposition. Indeed, at deposition, Rys never testified this was something she broached only once with her supervisors. Instead, she explained, "you get to know who everybody's partner is because one of the other things I was told was to ask people to go out with me, just randomly ask anybody to go out with me. *And they always had partners they had to go with.* And they would say, I can't, I got to go with such and such. And I said, okay." JA-220 [emphasis added]. This testimony makes clear this was an ongoing issue, not a singular event.

At deposition, appellant further testified, "**When I *would go* to S.P.O. Johnson for a partner to go into an area that was, you know, not safe, she would say**, okay, there are these other two parole officers I had to ask. I did. They were so angry [I] had to go with them." JA-219 (emphasis added). The words "when I would go," makes clear this was not a one-time occurrence. Appellant made clear this was an ongoing issue, not one which happened once. She also made clear that she did not speak repeatedly with appellees about being rebuked by the other parole officers when she sought assistance because they projected the same lack of concern for her well-being. JA-223.

The cases appellees cite in support of the claim that plaintiff submitted a sham affidavit are readily distinguishable. In *In re Fosamax Prods. Liab. Litig.*,

7

707 F.3d 189, 193-94 (2d Cir. 2013), a medical expert changed his account of whether he knew plaintiff was taking a medication to which she attributed significant harm. Both the district court and this court held that the inconsistencies in his testimony were material, unequivocal and could not be explained away.

> "As relevant here, we emphasize that a sham issue of fact exists only when the contradictions in an expert witness's testimony are inescapable and unequivocal in nature. *See Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 702 F.3d 685, 696 (2d Cir.2012) (concluding that summary judgment was inappropriate because the inconsistencies in the plaintiffs testimony were not "real, unequivocal, and inescapable contradictions]"). [4]Here, Dr. Epstein's February 2011 expert deposition testimony inescapably and unequivocally contradicted the testimony he gave in August 2008. In 2008 Dr. Epstein admitted he "did not know that [Secrest] was on Fosamax from 2003 to 2005." In February 2011 Dr. Epstein told a diametrically different story, testifying that he "knew she was on [Fosamax]" in 2004 to 2005 and that he had "advised [Dr. Hidlebaugh] to continue my [Fosamax] treatment." We cannot reconcile his new testimony with his prior testimony.

> Had there been some readily apparent, plausible explanation for these inconsistencies, or had Secrest proffered such an explanation, we might conclude that the District Court had erred in rejecting Dr. Epstein's testimony. We have explained that "'if there is a plausible explanation for discrepancies in a party's testimony, the court ... should not disregard the later testimony because an earlier account was ambiguous, confusing, or simply incomplete.'" *Rojas v. Roman Catholic Diocese of Rochester,* 660 F.3d 98, 106 (2d Cir.2011) (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 555 n. 2 (2d Cir.2005))."

No such unequivocal or material differences exist in plaintiff's testimony: she maintained throughout the lawsuit that she was assigned a heavier caseload than similarly situated parole officers; her Complaint includes the snow cone comment; she never testified at deposition that she spoke with Johnson only once

about not having a field partner. Appellant refreshed her memory as to the number of precincts she was assigned after reviewing the farewell card. No other part of her Declaration contradicts her deposition testimony.

For these reasons, employing the sham affidavit doctrine was erroneous and in conducting its *de novo* review, this court should reject reliance on that doctrine and view the facts most favorably to appellant, as presented in her deposition, the supporting exhibits offered and her Declaration.

III. **A REASONABLE JURY COULD CONCLUDE THAT APPELLEES SUBJECTED RYS TO A HOSTILE WORK ENVIRONMENT and CONSTRUCTIVELY DISCHARGED BECAUSE OF HER RACE**

A reasonable jury could conclude that Rys received a heavier caseload than her minority co-workers and that, though she requested one, neither Johnson nor Davis assigned her a field partner. A reasonable jury could also conclude that even after she learned of the parolee's vicious threats to Rys, appellee Johnson assigned appellant to guard him at the hospital even though protocol required the supervisor to assign someone else to do so. And then, despite Holland's direction, neither supervisor reassigned the dangerous parolee from Rys' caseload after he made vile threats against her and her family. The jury could find that this failure deviated from one of the supervisors' principal responsibilities – keeping their subordinates safe. The jury could also find that, in explaining their failure to abide by this

9

direction by claiming either that they did not receive the direction or citing a non-existent policy of maintaining a parole officer's assignment while there was an outstanding notice of violation, appellees lied. Nor did either supervisor arrange for appellant to have access to a safe parking area though they continued the threatening parolee on her caseload and had the discretion to avail Rys of this secure parking.

Each of these acts/omissions is objective evidence of a hostile work environment. A reasonable person would find each of these actions hostile and certainly there is no credible dispute but that Rys so understood each. Moreover, by dint of the combination of cited omissions, Rys' workplace was made more dangerous and physically threatening. *Littlejohn v. City of New York*, 795 F.3d 297, 320-21 (2d Cir. 2015).

Simply stated, appellees assigned Rys without a field partner to supervise parolees in multiple precincts where Caucasians ventured primarily to enforce the law. Since Rys repeatedly asked Johnson to assign a field partner, the latter appellee must have known that appellant was having no success finding a partner. Yet, Johnson did not rectify this situation. When she learned that a parolee had been threatened, Johnson again took no steps to protect Rys but allowed the situation to escalate before assigning other parole officers to the hospital. And then,

10

despite Holland's direction and appellant's protestations, both appellees maintained the dangerous parolee on appellant's caseload.

Appellees do not contest that, taken most favorably to appellant, the record supports appellant's conclusions. However, they counter that she cannot demonstrate that her superiors intentionally acted or omitted to act on account of her race. [Appellees' Brief at 25]. This argument is unavailing and should be rejected. First, plaintiff need not offer direct evidence of racial bias and that could not be clearer. Appellees concede that disparate treatment may allow a reasonable jury to conclude that "the supervisor acted with discriminatory intent," [Appellees' Brief at 26] but simply deny they engaged in such treatment. But, as shown above, this conclusion rests on disputed issues of fact and could not be resolved on a motion for summary judgment. Second, if her supervisors did behave as appellant avers, they have certainly offered no reasons for treating appellant disparately when compared with her minority peers or for their deviations from protocols intended to keep parole officers safe.

Appellees respond that there is no record evidence that they assigned field partners to others and cite pages in the Joint Appendix they claim show the contrary. But at JA-143, appellant merely describes the role of a field training officer, does not address the assignment of a field partner and is not asked any question pertinent to the disparate treatment issue. Nor does Johnson at JA-406.

11

Likewise, at JA-321, appellee Davis impertinently explained that plaintiff should have been assigned a field training officer to shadow but could not recall who was assigned to appellant. JA-324-26 establishes Davis's supposition that someone field-trained Rys "[b]ecause all new officers are assigned a field training officer." At JA-327-28, Davis claims that "all parole officers have an assigned partner. I know she would have had a partner…Who her partner was at that time, I don't know...a parole officer can be assigned one partner but go in the field with someone else."

Nothing in this testimony is inconsistent with appellant's testimony that all parole officers except her were assigned a partner who worked with them "in general." JA-328: 8-13. At JA-462, Johnson confirmed that a parole officer was assigned a partner "for office coverage." Rys was "never given a partner." JA-604, para. 6. Nor did appellees encourage anyone to go into the field with her. *Id.*

Likewise, plaintiff offered both her own testimony and a farewell card to establish that she was given both more numerous and more onerous assignments than her peers. Appellees claim that the card is inadmissible hearsay, but it is reliable corroboration of appellee's claim that she had nightmarish assignments that were distinct from others. Such lay opinion, if offered at trial, would be admissible. "The trial court also has discretion to allow lay opinion testimony based on the witness's observations where that testimony will be helpful to the

12

factfinder in determining a fact in issue. *See, e.g.,* Fed. R. Evid. 701(b); *Howley v. Town of Stratford,* 217 F.3d 141, 155 (2d Cir. 2000); *United States v. Urlacher,* 979 F.2d 935, 939 (2d Cir. 1992); *Brady v. Chemical Construction Corp.,* 740 F.2d 195, 201 (2d Cir. 1984)." *BIC Corp. v. Far E. Source Corp.,* 23 F. App'x 36, 38 (2d Cir. 2001). Appellees, who made assignments, provided no refutation of Rys's testimony concerning the more onerous and numerous assignments provided to her.

Johnson admitted that supervisors typically reassigned parolees who threatened their officers to another parole officer. JA-425. She also discussed this with Davis, her supervisor, after learning of the threat. Id. On June 25, 2022, Senior Investigator Holland directed that Rys be removed from supervising a parolee who had threatened to rape her and her daughters and envisioned her as "dead." JA-527, JA-533. "PO Rys should be removed from this parolee and another PO assigned this case." Id. Rys was not removed from this parolee's supervision. Davis opposed her removal and claimed that because she had written up a parole violation, she needed to stay on the case. JA-345:12-22. This is false and Sr. Investigator Holland reiterated the same direction five weeks after his original direction. JA-531. Then he went further: PO Rys should be temporarily assigned to an office "out of the 5 boros." *Id.*

In fact, none of this happened: Davis retained Rys on A.R.'s case; neither she nor Johnson allowed appellant to use a secure parking garage to protect her from

13

an attack by A.R. who was out of custody and, having absconded, was roaming wherever he wanted to during much of the relevant time period.

Appellees concede that direct evidence of discrimination is not required in a hostile work environment case. *Tassy v. Buttigieg*, 51 F.4th 521 (2d Cir. 2022). But, appellees argue that deviating from policy is not evidence of discrimination unless it be shown that they followed policy with opposite race parole officers. Johnson's cited testimony established that "typically" – her word – such reassignments are made. Therefore, appellees' claim there is no evidence establishing standard practice is fallacious. Moreover, deviation from policy itself is sufficient to constitute circumstantial evidence of racial discrimination. *Johnson v. Michigan Dep't of Corr.*, 865 F.2d 258 (6th Cir. 1988).

As applied, a reasonable jury could agree with appellant that her supervisors failed to take the primary steps required to respond to A.R.'s vile threats: they did not reassign A.R. to another officer; they required her to appear at a violation hearing with him; they failed to arrange secure parking for her and they failed to move her to another borough though they knew A.R. was out on the street and that Holland had so recommended. And this was not the first instance where plaintiff's safety was jeopardized: she repeatedly requested that Johnson assign her a partner, but "Johnson reacted with indifference to my requests for assistance in partnering with others." JA-605, para. 10.

14

When combined with their failure to assign her a partner despite her repeated requests and the nature of her caseload, her supervisors' failure to follow Holland's directives and transfer A.R. from Rys' caseload justified her conclusion that, as the only Caucasian parole officer assigned to Brooklyn, JA-447:11-19, she was being disparately treated and placed at risk for serious physical harm. As appellant explained, "There was never any acknowledgment by or from either defendant that continuing my involvement on this [A.R.'s case] after the vile threats made against me further imperiled me." JA-606, para. 14.

Appellant's decision to resign in this light was a reasonable response to the hostile treatment and resulted from the hostility evinced toward her by her supervisors.

## CONCLUSION

Taking the record evidence most favorably to her, appellant showed that she was subjected to disparate treatment which imperiled her safety. This created both a hostile work environment and supported her constructive discharge claim. Accordingly, the district court erred when it granted appellee supervisors' motion for summary judgment. The decision should be reversed and the matter remanded for trial.

15

Respectfully submitted,

MICHAEL H. SUSSMAN

Sussman & Associates
Counsel for Appellant Rys
1 Railroad Avenue, Ste. 3
Goshen, NY 10924
(845)-294-3991
Sussman1@sussman.law

16

## CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) as it contains 3,582 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in Time New Roman 14-point type for text and footnotes.

Dated: October 26, 2025

_____
Michael H. Sussman, Esq.